**David MALIN, et al., Plaintiffs,**

v.

**IVAX CORPORATION, Phillip Frost, Jack Fishman, Michael W. Fipps, and John H. Klein, Defendants.**

No. 96–1843–Civ.

United States District Court, S.D. Florida.

Aug. 18, 1998.

---

Emily Cornelia Komlossy, Jonathan M. Plasse, Goodkind Labaton Rudoff & Sucharow, Fort Lauderdale, FL, Stanley M. Grossman, Pomerantz Haudek Block & Grossman, New York, NY, for David Malin.

Emily Cornelia Komlossy, Goodkind Labaton Rudoff & Sucharow, Fort Lauderdale, FL, for Malin, Ferretti, Pennsylvania Pension Fund Plaintiffs Group, Ellen B. Stark, Evelyn Stern, Jerry Stern, Peter Zaphiris,

Sierra Enterprises Profit Sharing Plan, P. Diamond Family limited Partnership, John Pleggenkuhle, Robert J. Bell, Judith L. Bell, Junior F. Kreps, Rudolph Schott, Donna J. Goldstein, Stephen J. Margolin, Dale H. Austin, Michael Knopf, Berchan Family Trust, Brian Bloom, Attracta O'Neill, J. J. Deluca, Arnold A. Saltzman Revocable Trust, Saltzman Foundation, 215 West 40th Street Co., Eric Saltzman Revocable Trust, Xylon Saltzman '76 Trust, Marian Slatzman, '76 Trust, Ellen Steiner, Robert Orovitz, Bernard Kagen Smith Barney Inc. Rollover Cust.

Harvey W. Gurland, Jr., Eckert Seamans Cherin & Mellot, Miami, FL, for Commonwealth of Pennsylvania, Public School Employees Retirement Board.

Isaac Jaime Mitrani, Mitrani Rynor & Adamsky, Miami, FL, Richard A. Cirillo, Lori A. Martin, Cynthia Wachenheim, Rogers & Wells, New York, NY, for John Klein.

Bradford Swing, Stearns Weaver Miller Weissler, Alhadeff & Sitterson, Museum Tower, Miami, FL, for Michael W. Fipps.

Jane Wollner Moscowitz, Miami, FL, Jan Douglas Atlas, Eric Allan Lee, Atlas Pearlman Trop & Borkson, Fort Lauderdale, FL, Emily Cornelia Komlossy, Goodkind Labaton Rudoff & Sucharow, Fort Lauderdale, FL, Peter G.A. Safirstein, Stanley M. Grossman, Pomerantz Haudek Block & Grossman, Craig G. Harley, Chitwood & Harley, Atlanta, GA, for Gus Ferretti, Liberta Ferretti, Barbara Hafer, George Weiss.

Jane Wollner Moscowitz, Miami, FL, Emily Cornelia Komlossy, Goodkind Labaton Rudoff & Sucharow, Fort Lauderdale, FL, for Irving K. Braunstein, Arloa J. Torok.

### ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

MORENO, District Judge.

This case is a securities fraud class action suit brought against the IVAX corporation and three individual defendants by a class of Plaintiffs who purchased IVAX common stock between July 31, 1995 and June 27, 1996. Plaintiffs allege that they were fraudulently induced to make these purchases by the materially false and misleading statements and omissions made by the Defendants. The Plaintiffs' claims present the issue of the extent to which the Private Securities Litigation Reform Act of 1995 ("Reform Act") has made stricter the pleading requirements for securities fraud actions. Because the Court finds that the Plaintiffs have failed to satisfy the requirements of Section 21D(b) of the Reform Act, 15 U.S.C. § 78u–4(b), the Court grants the Defendants' motion to dismiss, but grants Plaintiff leave to amend the Complaint.

### I. Factual Background

#### A. The Defendants

IVAX is a pharmaceutical company headquartered in Miami, Florida. One of its primary lines of business is the manufacture of generic drugs, a business that has proved in recent years to be highly volatile. IVAX sells its pharmaceutical products principally to wholesalers and large retail chains.

Defendant Frost has been at all times relevant to this case the Chairman of IVAX's Board of Directors and Chief Executive Officer. He also served as the company's President from July 1991 until January 1995. Defendant Fipps was at all relevant times the Senior Vice President of Finance and the Chief Financial Officer. Defendant Fishman is the Vice Chairman of the Board of Directors. Between May 20, 1996 and May 31, 1996 (that is, shortly before the June 27, 1996 drop in the price of IVAX common stock), Fishman sold 100,000 shares of IVAX common stock at prices ranging from $27.38 to $29.50, for total proceeds of $2,871,376. This sale amounted to under 5% of Fishman's IVAX stock holdings. Frost, during the same period, bought quantities of IVAX stock.

Defendant Klein is in a different position from the other Defendants. He was never an officer or director of IVAX and never

signed any financial disclosures on behalf of IVAX. Rather, Klein was the President and Chief Executive Officer of Zenith Laboratories, Inc. ("Zenith"), a former competitor of IVAX in the generic pharmaceuticals market, acquired by IVAX in December 1994. In January 1995, Zenith was combined with Goldline Laboratories, Inc., IVAX's generic pharmaceutical distribution arm, to form IVAX's North American MultiSource Pharmaceutical Group ("MultiSource"). Upon IVAX's acquisition of Zenith, Klein remained President of Zenith and became President of MultiSource. He subsequently left IVAX in January 1996. Plaintiffs concede that Klein made no material misrepresentation but maintain that Klein was nevertheless an integral part of the alleged scheme to defraud that is discussed below.

## B. IVAX's Price Discounts

During the class period, IVAX sought to achieve and maintain maximum market shares of its generic pharmaceuticals by offering price discounts and other incentives while at the same time offering its customers "price protection" or "shelf stock adjustments." Pursuant to this practice, IVAX guaranteed its customers credits or rebates in the event that IVAX reduced its price on a product while the customer retained inventory of that product. Because of these inducements and other volume discounts, certain customers purchased substantial advance inventories of IVAX products.

Plaintiffs allege that this practice led to artificial sales and inflated IVAX's financial results for four consecutive quarters, from June 30, 1995 through March 31, 1996. These allegedly artificial financial results were included in IVAX's 1995 Form 10–K and Form 10–Qs for the second and third quarters of 1995 and the first quarter of 1996. The 1995 10–K was signed by Defendants Frost, Fishman, and Fipps, and each of the 10–Qs for the second and third quarters of 1995 and the first quarter of 1996 was signed by Defendant Fipps.

In each public filing, IVAX represented that the financial statements were presented in conformity with Generally Accepted Accounting Principles ("GAAP"). Plaintiffs allege that IVAX failed to disclose that these credit and rebate practices were taking place and that they materially affected the accuracy of IVAX's purported financial results. Plaintiffs contend that the failure to disclose these practices and discount for their effect on IVAX's financial results violated GAAP and materially misled the market as to the value of IVAX common stock.

On June 27, 1996, IVAX announced that, as a result of a sudden decline in drug prices driven by vigorous competition and consolidation of the distribution network and the resultant necessity of paying credits and allowances for this decline in prices, its earnings for the second quarter of 1996 would be sharply lower than projected. IVAX anticipated that these practices would reduce the company's revenues and operating income by approximately $18 million. IVAX stock dropped $8.62 that day to close at $15.25.

In August 1996, IVAX announced that it would post a loss for the second quarter of $13.9 million largely due to inventory credits to customers. On September 20, 1996, IVAX announced a substantial restructuring of its generic pharmaceutical selling, marketing, and manufacturing processes. On November 11, 1996, IVAX announced a net loss for the third quarter of $178.7 million, or $1.47 per common share, and that the company was suspending its third quarter dividend and taking a $104.3 million pre-tax charge, of which $55.9 million was related to IVAX's U.S. generic drug distribution business.

## C. Plaintiffs' Claims

Within days of IVAX's June 27, 1996 earnings forecast and resultant stock price decline, numerous securities class action suits were filed against IVAX. All of those suits were consolidated under the Amended Class Action Complaint filed by the Plaintiffs on November 15, 1996 (the "Complaint"). Plaintiffs bring two causes of action under the Securities Exchange Act of 1934:(1) Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5

promulgated thereunder, 17 C.F.R. § 240.10b–5; and (2) Section 20(a), 15 U.S.C. § 78t(a). Plaintiffs' Complaint also includes a count for common law negligent misrepresentation.

The heart of the Plaintiffs' claims is that IVAX knowingly or recklessly failed to disclose its rebate practices and the contingent nature of IVAX's sales, thereby misrepresenting the strength of IVAX's financial position, in order to maintain a high stock price to facilitate mergers and acquisitions. Plaintiffs contend that in addition to pursuing its policy of expanding and acquiring smaller companies, IVAX itself was named as a possible acquisition candidate by a German company, BASF AG, and a Swedish company, Astra AB, and therefore had a powerful incentive to make certain that its stock price performed at a level that would justify the speculated stock price. Plaintiffs further allege that Defendant Klein, anticipating and negotiating a lucrative severance package that included substantial stock options, had the additional incentive of maintaining and increasing the value of his severance package. Finally, Plaintiffs allege that Defendant Fishman, having sold $2,871,376 worth of shares of IVAX common stock just before the drop in IVAX stock value, similarly had a significant financial interest in preserving the value of IVAX stock.

Defendants seek to counter Plaintiffs' allegations of a failure to disclose IVAX's price protection practices by submitting financial reports filed with the SEC that the Defendants contend in fact disclose such sales practices. Defendants would have this Court dismiss the Plaintiffs' complaint on the grounds that it fails to allege both fraud and scienter with the particularity now required by the federal securities laws. Defendant Klein further argues that the Plaintiffs having alleged no misrepresentation on his part, the Plaintiffs' attempt to hold him liable under an accomplice theory of liability is prohibited by Supreme Court case law.

#### D. The Report and Recommendation of the Magistrate Judge

Defendants' motions to dismiss were initially referred to a Magistrate Judge. The Magistrate Judge found first that it could not consider, on a motion to dismiss, the Defendants' submissions of various quarterly, annual, and other financial reports filed by IVAX with the SEC. Next, the Magistrate Judge concluded that the Reform Act codified the Second Circuit standard with regard to the pleading requirements for scienter. Applying that standard, the Magistrate held that the Amended Complaint failed to set forth with sufficient particularity what the allegedly misleading statements made by IVAX were, why they were misleading, and what facts give rise to a strong inference that the Defendants acted with the requisite scienter. Accordingly, the Magistrate Judge recommended that the Court grant Defendants' motions to dismiss without prejudice and grant the Plaintiffs leave to amend the Complaint. Both the Plaintiffs and the Defendants filed objections to that recommendation. Oral argument was heard on the parties' objections, and numerous supplemental pleadings were filed.

### II. Legal Analysis

#### A. Standard of Review

A court will not grant a motion to dismiss unless the plaintiff fails to prove any facts that would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hospital, Inc. v. Hospital Corp. of America,* 795 F.2d 948 (11th Cir.1986).

#### B. Sections 10(b) & 20(a)

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). One such rule is Rule 10b–5, which makes it unlawful "[t]o make any untrue statement of

a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (1995). To successfully allege securities fraud under Rule 10b–5, a plaintiff must show the following: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied, (5) that proximately caused his injury. *Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir.1989) (en banc). Plaintiffs may allege reliance using the "fraud on the market" theory for both securities issued in an undeveloped or primary market, *see Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (en banc), and securities sold in a secondary market, *see Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Under the fraud on the market theory, the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market. *Shores,* 647 F.2d at 469. Defendants may, of course, respond to a claim of fraud on the market by asserting that the information allegedly withheld from the market had in fact entered the market. *See Basic,* 485 U.S. at 248–249, 108 S.Ct. 978.

■ In *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994), the Supreme Court held that § 10(b) prohibits only the making of a material misstatement or omission or the commission of a manipulative act; that section does not include giving aid to a person who commits a manipulative or deceptive act. Aiding and abetting the securities violations of others is therefore beyond the scope of that statute.

■ Under § 20(a) of the Exchange Act, any person who "controls" someone who violates the Act is liable for this violation. 15 U.S.C. § 78t(a). The Exchange Act's implementing regulations define control as "the possession, direct or indirect, of the power to direct or cause the direction of the management policies of a person." 17 C.F.R. § 230.405. To allege controlling person liability under § 20, a plaintiff must allege (1) that the defendant had the power to control the general affairs of the primary violator, and (2) that the defendant had the power to control the specific corporate policy that resulted in the primary violation. *Brown v. Enstar Group Inc.,* 84 F.3d 393, 396 (11th Cir.1996). Of course, without a primary violation of the securities laws, there can be no secondary violation under § 20(a). *See id.* at 396–397; *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1132 (2d Cir.1994).

## C. Consideration of Matters Outside the Complaint

■ As an initial matter, the Court follows the holding of numerous Courts of Appeals that "[w]hen deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996); *accord Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42 (2nd Cir. 1991); *Kramer v. Time Warner Inc.,* 937 F.2d 767 (2nd Cir.1991). In recommending that such materials not be considered, the Magistrate Judge noted that the Eleventh Circuit had not adopted this approach. And while it is true that the Eleventh Circuit has not yet spoken on the issue, this Court is persuaded by reasoning of the Fifth and Second Circuits that considering such submissions at this time makes sense. First, it would be highly inconsistent and illogical for a court to fail to consider the entirety of a defendant's SEC filings when the plaintiff alleges a failure to disclose material information. Were a court to take such an approach, a plaintiff bringing even a baseless claim could easily overcome a motion to dismiss and gain the right to engage in extensive discovery simply by selectively choosing portions of the defendant's statements out of context. The Reform Act clearly evinces an intent on the part of Congress to prevent such abusive securities litigation tactics.

Second, as the documents are required by law to be filed with the SEC, no serious question as to their authenticity can exist. For this reason, the Second and Fifth Circuits have concluded that a court may properly take judicial notice of publicly disclosed SEC filings pursuant to Fed.R.Evid. 201(b)(2). *See Kramer,* 937 F.2d at 774; *Lovelace,* 78 F.3d at 1018 n. 1. Finally, as the Second Circuit has noted, the reasoning behind converting a Rule 12(b)(6) motion to dismiss into a motion for summary judgment is to require that the nonmovant receive notice of the movant's submissions in order to address their relevance. *See Cortec,* 949 F.2d at 48. Where those submissions are publicly filed, and indeed where the plaintiff has relied on them in framing the complaint, the necessity of notice is largely dissipated. *See id.* Notice is even less of a concern in this case as both sides were given an opportunity to address at oral argument and to file supplemental legal memoranda regarding the significance of the Defendants' submissions. Accordingly, in ruling on the Defendants' motions to dismiss, the Court has considered those financial documents submitted by the Defendants that were required to be, and were actually, filed with the SEC.

## D. The Reform Act

In December 1995, Congress adopted the Reform Act over the veto of President Clinton. The Act was intended to redress abusive securities litigation in which meritless claims were brought in the hope of using the discovery process to uncover evidence of fraud not alleged in the complaint. Congress heard evidence that the expense of defending such suits at times led defendants to agree to settlements that provided little financial benefit to the claimed victims of the fraud, but fully compensated plaintiffs' lawyers with large fee awards. The Reform Act prohibits certain kinds of securities claims and implements various procedural protections in an effort to insure that baseless claims are disposed of before a defendant is forced to engage in expensive, protracted discovery.

Relevant to this case is § 21D(b), perhaps the Reform Act's most controversial section, which strengthens the pleading requirements for fraud and scienter.[1] Section 21D(b) imposes two distinct requirements. First, a would-be securities plaintiff must specify each alleged misrepresentation and state with particularity the facts surrounding that misrepresentation.[2] In addition, in order to survive a motion to dismiss, a securities plaintiff must, with respect to each alleged misrepresentation, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite culpable mental state.[3]

Although Congress intended this section to resolve a split in the circuits over the pleading requirements for securities fraud claims, imprecise drafting and conflicting legislative history have resulted in a continuing disagreement among federal courts over the proper interpretation of these provisions. Prior to the enactment of the Reform Act, courts uniformly held that recklessness con-

---

**1.** Section 21D(b) has been codified as 15 U.S.C. § 78u–4(b).

**2.** 15 U.S.C. § 78u–4(b)(1) states:

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading; and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**3.** 15 U.S.C. § 78u–4(b)(2) states:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

stituted scienter under Rule 10b–5.[4] The courts were divided, however, on the question of what facts alleging scienter the plaintiffs had to plead. In the absence of statutory or Supreme Court guidance, the courts turned to Rule 9(b) of the Federal Rules of Civil Procedure, which provides: "In all averments of fraud … the circumstances constituting fraud … shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Applying this standard, the Second and Ninth Circuits developed two very different tests for pleading scienter. The Second Circuit's stricter test required plaintiffs to allege specific facts creating a "strong inference" that the defendants acted with the requisite scienter. *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987). A plaintiff could establish this strong inference by alleging either (a) facts constituting strong circumstantial evidence of reckless or intentional conduct, or (b) facts showing that the defendant had both a motive to commit fraud and a clear opportunity to do so. *Shields,* 25 F.3d at 1128. Under the Ninth Circuit's more lenient pleading standard, a plaintiff could satisfy the scienter requirement simply by pleading the necessary mental state, without setting forth any facts supporting that allegation. *See In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1545 (9th Cir.1994) (en banc).

It is plain enough from reading § 21D(b)(2) that Congress favored a strict pleading requirement, adopting the "strong inference" standard. But whether Congress in fact intended to adopt wholesale the Second Circuit's pleading standard or some other stricter pleading requirement has been much debated. *See* Seth Goodchild & Stephenie L. Brown, *Institutional Investors and PSLRA Pleading Standard,* N.Y.L.J., Sept. 5, 1997, at 1 ("The most controversial and

hotly litigated issue in securities fraud class actions in the post-[Reform Act] era is the Act's heightened requirements for pleading scienter."). Predictably, the Reform Act's legislative history does not entirely resolve the question, but a brief summary of that history is nevertheless instructive.

The first incarnation of § 21D(b) took the form of Title II of H.R.10, a bill proposed in the House of Representatives that would have required plaintiffs to plead direct evidence of intentional conduct and abolished liability for recklessness altogether. *See* H.R.10, 104th Cong. § 204 (1995). The SEC vigorously opposed this proposal, arguing that it would encourage corporate officers to ignore indications of fraud. *See* H.R.Rep. No. 104–50 at 63 (1995) (comments of Arthur Levitt, Chairman, SEC). The view of the SEC prevailed, as the final House version of the bill, titled H.R.1058, reinstated liability for recklessness. *See* H.R.1058, 104th Cong. (1995). Although the bill passed the House, it was eventually rejected by the Conference Committee in favor of the Senate version.

The second incarnation of § 21D(b) occurred in the Senate, in the form of S.240, which included the Second Circuit's strong inference language, but did not expressly adopt the motive and opportunity test. *See* S.Rep. No. 104–98, at 15 (1995). The Senate Report indicates that the Senate Committee had "chose[n] a uniform standard modeled upon the pleading standard of the Second Circuit," but noted that it "[did] not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive." *Id.* As the Second Circuit's pleading standard was itself judicially created, the Committee's disavowal of the case law interpreting it is rather cryptic.

In June of 1995, Senator Arlen Specter proposed an amendment that would have

---

4. *See McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989); *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569–70 (9th Cir. 1990); *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989); *Van Dyke v. Coburn Enter. Inc.* 873 F.2d 1094, 1100 (8th Cir.1989); *Hackbart v. Holmes,* 675 F.2d 1114, 1117–18 (10th Cir.1982); *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc); *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1023–24 (6th Cir.1979); *Cook v. Avien, Inc.,* 573 F.2d 685, 692 (1st Cir.1978); *Rolf v. Blyth Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978); *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1044 (7th Cir.1977).

clarified the confusion and fleshed out the scienter pleading requirement by adopting in full the Second Circuit's case law and two-part test. *See* 141 Cong.Rec. S9170 (daily ed. June 27, 1995). Consistent with the Second Circuit standard, under the Specter Amendment, a plaintiff could satisfy the "strong inference" standard of § 21D(b)(2) by pleading facts (1) constituting strong circumstantial evidence of conscious behavior or recklessness, or (2) showing that the defendant had a motive and opportunity to commit fraud. *See* Amend. 1485, S.240, 104th Cong., 1st Sess. (1995). Although this amendment passed, the Conference Committee later eliminated this language from the bill's final version. The final Conference Report and Statement of Managers, released on November 28, 1995, explained that decision. The Conference Committee noted that the language of § 21D(b)(2) was based only "in part" on the Second Circuit's pleading standard. *See* H.R.Rep. No. 104–369, at 41 (1995). Although the Committee regarded the Second Circuit standard as "the most stringent pleading standard ... [b]ecause the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." *Id.* Moreover, apparently in reference to the omission of Senator Specter's amendment, the committee expressly noted in a footnote that "the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." *Id.* at 41 n. 23. Not clear from this language, however, is whether the Committee's omission represents an express disavowal of the Second Circuit's pleading standard or a simple unwillingness to codify it.

In vetoing the legislation on December 19, 1995, President Clinton interpreted § 21D(b)(2) to constitute the former:

I believe that the pleading requirements of the Conference Report with regard to a defendant's state of mind impose an unacceptable procedural hurdle to meritorious claims being heard in Federal courts. I am prepared to support the high pleading standard of the U.S. Court of Appeals for the Second Circuit—the highest pleading standard of any Federal circuit court. But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.

H.R.Doc. No. 104–50, 104th Cong., 1st Sess. 240 (1995). Perhaps emphasizing its "crystal clear" intent to heighten the pleading standard, Congress overrode the President's veto and the bill passed into law on December 22, 1995.[5]

A few portions the Reform Act's legislative history seem instead to support the view that § 21D(b)(2) represents a mere codification of the Second Circuit's standard. These excerpts are generally less convincing, however, and seem to reflect more the hopes of individual congressman rather than the views of the Committee. For example, on December 5, 1995, Senator Alfonse D'Amato submitted the report of the Conference Committee to the full Senate and had only the following to say regarding the new pleading standard: "The legislation creates a uniform standard for complaints that allege securities fraud. This standard is already the law in New York. It requires a plaintiff plead facts giving rise to a strong inference of the defendant's fraudulent intent." 141 Cong.Rec. S17,934 (daily ed. Dec. 5, 1995). While the Plaintiffs point to this quote as evidence that the Reform Act codified the Second Circuit's motive and opportunity test, Senator D'Amato's comments go more generally to § 21D(b)'s strong inference language, and do not really address the sufficiency of pleading motive and opportunity. Similarly, in a colloquy that followed between Senators Christopher Dodd and Specter, Senator Specter commented that the deletion of motive and opportunity language in his amendment omitted a critical factor to guide the courts in evaluating a plaintiffs' state of mind pleadings and created an impossible pleading standard. *See id.* Senator Dodd responded

5. The House vote was 319 to 100. The Senate voted 68–30.

that the Reform Act's language endorsed the Second Circuit's standard, but permitted individual courts to use their discretion on a case by case basis: "We are using the standards in the second circuit in that regard, then letting the courts—as these matters will—test. They can then refer to specific cases, the second circuit, otherwise, to determine if these standards are based on facts and circumstances in a particular case." *Id.* While not a model of clarity, Senator Dodd's comments summarize the views of some of the Reform Acts supporters and echo the language of the Senate Report discussed above indicating that courts could look to Second Circuit case law for guidance.

### E. Judicial Interpretation of Section 21D(b)

Section 21D(b) essentially presents the courts with three interrelated issues. First, a court must consider what impact § 21D(b)(1) has on Rule 9(b)'s requirement of pleading fraud with particularity. This provision has generally been the subject of little judicial debate. Second, a court must determine whether recklessness remains a basis for establishing scienter under § 21D(b)(2). Finally, a court must determine what facts a plaintiff must plead to satisfy the scienter requirement, specifically, whether the Second Circuit's pre-Reform Act motive and opportunity pleading standard remains viable. The courts interpreting § 21D(b) have focused mainly on the latter two issues.

Despite the many indications in the legislative history that Congress intended § 21D(b)(2) to impose a stricter pleading requirement than the Second Circuit's motive and opportunity pleading, a majority of courts to address the issue have concluded that § 21D(b)(2) codified the Second Circuit's standard. The first decision to so hold came from the Central District of California. In *Marksman Partners v. Chantal Pharmaceu-*

*tical,* 927 F.Supp. 1297, 1308–1312 (C.D.Cal. 1996), the court held that both liability for recklessness and the Second Circuit's motive and opportunity pleading test survived the enactment of the Reform Act. As to the substantive scienter requirement, the court reasoned that had Congress intended to eliminate liability for recklessness, it could have stated so expressly, as it did in the Reform Act's "safe harbor" and "joint and several liability" provisions. *See id.* at 1309 n. 9; *see also* 15 U.S.C. § 78u–5(c)(1)(B) (requiring that a plaintiff prove actual knowledge of falsity in order to establish liability for forward-looking statements); 15 U.S.C. § 78u–4(g)(2)(A) (imposing joint and several liability only as to defendants found to have knowingly violated the securities laws). As to the pleading requirement for scienter, the *Marksman Partners* court further concluded that the Reform Act codified Second Circuit law wholesale, including the motive and opportunity test, citing both the legislative history describing the Second Circuit's pleading standard as the most stringent in existence and the Reform Act's adoption of the Second Circuit's "strong inference" language. *See Marksman Partners,* 927 F.Supp. at 1310–1312. The court rejected the argument that the Conference Committee had expressly declined to include the motive and opportunity language of the Specter Amendment, reasoning that Congress' decision not to include expressly such language could not be construed as a disavowal, especially where the Senate Report had specifically suggested that courts look to Second Circuit case law for guidance in applying the Reform Acts pleading requirements. Rather, the *Marksman Partners* court argued, had Congress intended to abandon the well-established motive and opportunity test, it would have done so in clear, unambiguous terms. *See id.* at 1311–1312. Numerous courts have subsequently adopted the *Marksman Partners* holding.[6]

A smaller minority of courts have reached the exact opposite conclusion, finding that

---

**6.** *See, e.g., In re Miller Indus., Inc.,* 12 F.Supp.2d 1323, 1327–28 (N.D.Ga.1998); *In re Health Management, Inc. Sec. Litig.,* 970 F.Supp. 192, 201 (E.D.N.Y.1997); *Shahzad v. H.J. Meyers & Co.,*

1997 WL 47817, at *7–8 (S.D.N.Y.1997); *Fugman v. Aprogenex Inc.,* 961 F.Supp. 1190, 1195 (N.D.Ill.1997); *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1250–57 (N.D.Ill.1997); *Press v.*

§ 21(D)(b) eliminates both recklessness as a basis of substantive liability and the motive and opportunity test as an independent method of adequately pleading scienter. The reasoning of the court in *In re Silicon Graphics, Inc. Securities Litigation,* 1996 WL 664639 (N.D.Cal.1996), exemplifies this approach. The court there relied heavily on the report of the Conference Committee and the abandonment of the Specter Amendment as evidence that Congress consciously rejected the motive and opportunity test in favor of a more stringent standard. *Silicon Graphics,* 1996 WL 664639, at *5–6.

The *Silicon Graphics* court applied the same analysis to the substantive issue of the sufficiency of recklessness as a basis of liability. Because the Specter Amendment had contained language permitting a plaintiff to plead facts constituting strong circumstantial evidence of reckless conduct, the court found that the Committee's abandonment of that amendment also indicated its intent to eliminate recklessness as a basis of scienter. *See id.* In short, the *Silicon Graphics* court held that a securities fraud plaintiff "must allege specific facts that constitute circumstantial evidence of conscious behavior by defendants" and cannot survive a motion to dismiss by pleading motive and opportunity to commit fraud. *Id.* at *6. Several courts have followed this approach.[7]

## F. A Third Alternative

As one would expect, the Defendants urge this Court to adopt the reasoning of the *Silicon Graphics* opinion, while the Plaintiffs contend that the *Marksman Partners* analysis, followed by the majority of courts, is the more sound approach. The Court finds neither analysis completely satisfying.

 First, the Court rejects the holding of *Marksman Partners* that § 21D(b)(2)

merely codified the Second Circuit's motive and opportunity test. Despite some of the inconsistencies of the congressional debate surrounding the Reform Act, it is clear enough from the legislative history that to allow plaintiffs to plead motive and opportunity alone as an automatic method of creating a strong inference of scienter would be unfaithful to congressional intent and the plain meaning of the Reform Act. The motive and opportunity test was well-known and much debated by Congress during the drafting of § 21D(b)(2), and the express rejection of an amendment containing that language deserves great weight. The reasoning of the *Marksman Partners* court that Congress could have expressly disavowed the motive and opportunity test if it had intended to discard it is unconvincing. The motive and opportunity test was never endorsed by the Supreme Court and was applied inconsistently throughout the circuits. Indeed, even within the Second Circuit, courts differed as its application, for example, on the issue of whether pleading motive and opportunity alone, without other circumstantial evidence of fraud, was sufficient to survive a motion to dismiss, *see* Douglas M. Parker, *Fraud Under Section 10(b) of Securities Exchange Act,* N.Y.L.J., April 11, 1994, at 1, and on the issue of what type of motive provides a strong inference of scienter, *compare In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 270 (2d Cir.1993) (holding that a desire to raise capital satisfies the motive prong) *with San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,* 75 F.3d 801, 814 (2d Cir.1996) (holding that a desire to raise capital does not satisfy the motive prong). Given the uncertain status of the motive and opportunity test in the circuit of its origin and elsewhere, it would be counterintuitive to require specific statutory disapproval from Congress to eliminate it. Thus, the Court agrees with the *Silicon Graphics*

---

*Quick & Reilly,* 1997 WL 458666, at *2, n. 2 (S.D.N.Y.1997); *Hockey v. Medhekar,* 1997 WL 203704 (N.D.Cal.1997); *In re Discovery Zone Sec. Litig.,* 943 F.Supp. 924, 935 (N.D.Ill.1996); *Sloane Overseas Fund v. Sapiens Intern. Corp.,* 941 F.Supp. 1369, 1377 (S.D.N.Y.1996).

**7.** *See, e.g., Voit v. Wonderware Corp.,* 977 F.Supp. 363, 373 (E.D.Pa.1997); *Powers v. Eichen,* 977 F.Supp. 1031, 1038 (S.D.Cal.1997); *Friedberg v. Discreet Logic Inc.,* 959 F.Supp. 42, 47 (D.Mass. 1997); *Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 208 (S.D.N.Y.1997).

court that pleading facts establishing motive and opportunity alone will not automatically suffice to allege scienter.

■ On the issue of recklessness, however, the Court believes that the *Marksman Partners* opinion is better reasoned. Whereas the intent to reject the motive and opportunity test as an independent basis for pleading scienter is clear enough from both the statute and its legislative history, there is no clear congressional intent to eliminate recklessness as a basis for liability. Section 21D(b)(2) is a provision addressing only pleading standards; nothing in the language of that provision purports to alter bases for substantive liability. Indeed, an attempt in the House of Representatives to eliminate recklessness as a basis for liability under Rule 10b–5, after much criticism by the SEC, was rejected by the House in the final House version of the bill. Unlike the uncertain motive and opportunity test, liability for recklessness was a rule recognized universally in the circuit courts. In such a case, it is indeed reasonable and proper to require that Congress expressly reject recklessness as a basis for Rule 10b–5 liability before a court should assume that a statute has that effect. As noted above, Congress did not hesitate in other provisions of the Reform Act to make crystal clear when liability could be based only on knowing conduct. In short, the Court rejects the holding of *Silicon Graphics* that recklessness is no longer a sufficient basis for liability under Rule 10b–5.

Taken together, the Court holds that § 21D(b)(2) requires a Rule 10b–5 plaintiff to state with particularity, with respect to each alleged misrepresentation, facts giving rise to a strong inference that the defendant made that misrepresentation recklessly or knowingly. In attempting to meet this standard, a plaintiff may allege facts indicating that the defendant had a motive and opportunity to make the misrepresentation; but those allegations alone will not automatically suffice to survive a motion to dismiss.

This Court will not be the first court to interpret § 21D(b)(2) in this manner. In *In re Baesa Securities Litigation*, 969 F.Supp. 238 (S.D.N.Y.1997), the court reached precisely the same conclusion.[8] Finding that resort to legislative history was unnecessary, the court there held that nothing in the Reform Act purports to overrule recklessness as the required scienter, "and the few cases that might be read to suggest otherwise have simply ... substituted a selective reading of the convoluted history for the clear and unambiguous language of the statute." *In re Baesa*, 969 F.Supp. at 241. The *In re Baesa* court took the same plain meaning approach to the pleading requirement, finding that the omission of any language regarding motive and opportunity could only be taken to mean that the Reform Act did not adopt the Second Circuit's test. *See id.* at 242. The court did not hold, however, that particulars regarding motive and opportunity are not relevant to pleading circumstances raising a strong inference of fraudulent scienter: "In some cases, they may even be sufficient by themselves to do so. But, under the Reform Act, and in contrast to prior Second Circuit precedent, they are not presumed sufficient to do so." *Id.*

This approach, which the Court adopts, not only is more faithful to the plain meaning and legislative history of the Reform Act, but also more effectively promotes the goal of the Reform Act of deterring and dismissing frivolous law suits without undermining the deterrent and compensation functions of private securities fraud claims. First, retaining liability for recklessness, as argued by the SEC and every court of appeals to address the issue, best promotes responsible corporate governance because it encourages corporate management to take an active role in verifying the factual assertions contained in public releases. The abolition of recklessness liability creates a dangerous incentive to corporate management to remain purposely ignorant of the claims being made in public releases.

**8.** The *In re Baesa* decision has been followed by at least two other courts. *See Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.,* 1998 WL 195299 (D.Colo.1998); *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1107 (D.Nev. 1998).

At the same time, reliance on the Second Circuit's motive and opportunity standard would be an ineffective means of deterring and dismissing baseless lawsuits, because the motive and opportunity test fails to create a strong inference of scienter and is too easily satisfied. As commentators have noted, a showing of motive and opportunity, absent a showing that the maker of the statement had some basis for believing that the statement was false, merely raises an inference that the defendant had a *reason* to make a false statement; it does not raise an inference that the defendant *knew* that the statement was false when made or recklessly disregarded the risk that it was false. *See* Ryan G. Miest, *Would the Real Scienter Please Stand Up: The Effect of the Private Securities Litigation Reform Act of 1995 on Pleading Securities Fraud,* 82 Minn.L.Rev. 1103, 1130–31 (1998). This fundamental weakness makes the motive and opportunity test ill-suited as a means of establishing the "strong inference" of scienter that § 21D(b)(2) requires.

In addition, the motive and opportunity test is too easily satisfied. A plaintiff can meet the opportunity prong of the test in all cases simply by naming as defendants individuals in a position to review and issue the alleged information, that is, the officers and directors controlling the company. The motive prong is scarcely more difficult. Maintaining the prestige of a company and the value of its stock, preventing hostile takeovers, retaining executive positions or obtaining performance-based bonuses, increasing the value of an officer's stock options or stock sales, all of these common, day-to-day goals of corporate management could conceivably be cited by a plaintiff as motives for a defendant to make a material misrepresentation, and courts applying the Second Circuit test have historically struggled to distinguish overly general and over-inclusive motives from those concrete enough to raise an inference

of scienter. *See generally* Parker, *supra;* Edward Brodsky, *Scienter Under the Reform Act of 1995,* N.Y.L.J., Jan. 8, 1997, at 3. Clearly the language of § 21D(b)(2) and the intent of Congress in enacting it require a more exacting standard.

### G. Application of this Standard to the Plaintiffs' Complaint

#### 1. Whether IVAX Disclosed Its Sales Practices

■ As an initial matter, the Defendants would have this Court dismiss the Complaint with prejudice on the grounds that IVAX fully disclosed the sales practices that the Plaintiffs allege that IVAX failed to disclose. After extensively reviewing all of IVAX's public documents filed with the SEC that the parties have submitted to the Court, and viewing the complaint in the light most favorable to the Plaintiffs as the Court must, the Court finds that the Plaintiffs have alleged a failure to disclose a material fact sufficient to survive a motion to dismiss.

Defendants try to characterize this action as a claim that IVAX failed to appraise the market of the risks inherent to the generic pharmaceutical business. But the Plaintiffs' claim turns on an issue much more specific: whether IVAX failed to disclose its practice of shelf-stock adjustment, the practice that Plaintiffs allege ultimately led to the sudden drop in IVAX's projected earnings. Defendants argue that practice was indeed disclosed. As evidence, it points to several public documents it filed with the SEC.[9] For example, IVAX's Form 10–K for the fiscal year ending December 31, 1995 stated:

> In the short term, IVAX' revenues and profits from its pharmaceutical operation may vary significantly from period to period, as well as in comparison to corresponding periods, as a result of regulatory and

**9.** Defendants also argue more generally that it was commonly known that such sales practices were employed in the pharmaceutical industry, and cite several reports from market analysts. These contentions, however, raise questions of fact and are not properly considered on a motion

to dismiss, where the Court must accept the Plaintiffs' well-pleaded facts as true. As discussed above, the legal principle that allows a court to consider matters outside of the complaint in cases such as this applies only to documents required to be filed with the SEC.

competitive forces unique to the generic pharmaceutical industry. Such factors include the timing of generic drug approvals received by IVAX, the number and timing of generic drug approvals for competing products, the timing of strategies adopted by brand name companies to maintain market share *and the effects of sales promotion programs.*

The first company to receive regulatory approval for and to introduce a generic drug is usually able to capture significant market share from the branded drug and to achieve relatively high revenues and gross profits from sales of the drug. As other generic versions of the same drug enter the market, however, market share, prices, revenues, and gross profits decline, sometimes significantly.

(emphasis added by the Court). Similarly, in IVAX's December 1, 1994 proxy statement, the company stated:

The market prices for securities of companies engaged in pharmaceutical development, including IVAX, have been volatile. Among other things, the announcement of technological innovations or new commercial products by IVAX or its competitors, changes in governmental regulation, regulatory approvals by IVAX or its competitors, developments relating to patents or proprietary rights by IVAX or its competitors, as well as period-to-period fluctuations in financial results, may have a significant impact on the market price of IVAX Common Stock.

More specifically, IVAX's Form 10–Q for the period ending March 31, 1994 stated: "The market entry of the verapamil competitor led the Company to establish a reserve of approximately $2.6 million for *price adjustments* relating to previous sales." (emphasis added by the Court). IVAX explained in more detail in its 10–Q for the first quarter of 1995:

The decrease in net revenues in the first half of 1995 compared to 1994 was due primarily to a reduction in the net selling price of verapamil caused by competition,

offset in part by increased volume caused by an increase in the substitution rate of generic verapamil for brand name verapamil.

. . . . .

The decline in the gross profit percentage was primarily attributable to the reduction of verapamil unit sales prices, in combination with competition in the domestic generic pharmaceutical distribution business. These factors were partially offset by a shift in sales mix to higher margin generic products manufactured by IVAX' domestic pharmaceutical operations and higher margin branded products manufactured by IVAX' international pharmaceutical operations combined with the favorable impact of *the reversal of $2.7 million of reserves deemed excessive at June 20, 1995 for inventories, customer rebates, sales returns and allowances.*

(emphasis added by the Court). In its Annual Report for the year 1993 filed with the SEC on July 8, 1994, IVAX stated:

The market entry of the verapamil competitor led the Company to establish a reserve of approximately *$2.6 million in the first quarter of 1994 for price adjustments related to previous sales and will require further reserves for price adjustments subject to ongoing market conditions.*

(emphasis added by the Court).

It is obvious from a review of these statements that the vast majority of IVAX's purported "disclosures" are more properly characterized as general statements regarding the volatile nature of the generic drug business. Even those sections that the Court has underscored which more specifically relate to IVAX's sales practices do not adequately disclose the sales practice that the Plaintiffs allege resulted in the drop in IVAX's projected earnings. At best, those statements reveal that IVAX had in place certain sales promotion practices and that a price adjustment program was in effect for the drug verapamil. But those sales promotion practices are never defined, and there

is no indication anywhere in IVAX's SEC statements that similar price adjustments practices were being used with respect to any other of IVAX's products. In short, the submissions offered by the Defendants do not belie the Plaintiffs' allegations that IVAX materially misrepresented IVAX's financial condition by failing to disclose a massive practice of shelf-stock adjustments on numerous pharmaceutical products, and the Defendants have therefore not satisfied the Court that the Complaint should be dismissed with prejudice.

### 2. Section 21D(b)(1): Pleading With Particularity All Facts Upon Which Belief is Formed

■ On the other hand, having carefully reviewed the Complaint for specific facts underlying the Plaintiffs' allegations, the Court agrees with the Defendants that the Plaintiffs' allegations fail to satisfy the specificity requirement of § 21D(b)(1). While few courts have addressed this section in any significant depth, clearly Congress intended courts to take seriously the requirement that a plaintiff plead with particularity all facts upon which the plaintiff is basing the information and beliefs contained in the plaintiff's allegations.

The Plaintiffs' Complaint is short on such facts. Plaintiffs essentially allege that a practice of shelf-stock adjustment existed, was employed by the Defendants in order to boost IVAX short-term sales and profits to further IVAX's interests in possible mergers or acquisitions, severely impaired the accuracy of IVAX's projected earnings, and was not disclosed in IVAX's SEC filings. The Plaintiffs have gone to great lengths to set forth explicitly the motive for this practice, citing IVAX's acquisition strategy and detailing the mergers with other companies that were rumored at the time. Plaintiffs have also explained in detail why the failure to disclose and set up a reserve for the shelf-stock adjustment allegedly violates GAAP. But § 21D(b)(1) requires more. Upon what facts do the Plaintiffs base their belief that the shelf-stock adjustment practice existed? As

to which products was the practice in place? Who were the customers given such shelf-stock adjustments? How much inventory of product did those customers buy? When was IVAX forced to adjust the price of that inventory and to what extent? To what extent did these adjustments affect IVAX's financial projections? These are just some of the questions that a complaint must answer to satisfy the requirements of § 21D(b)(1). Accordingly, the Court grants the Defendants' motion to dismiss for failure to state with particularity all of the facts upon which the beliefs contained in the Complaint are formed.

### 3. Section 21D(b)(2): Pleading With Particularity Facts Giving Rise to a Strong Inference of Scienter

■ The Plaintiffs have also failed to state with particularity facts giving rise to a strong inference that the Defendants acted recklessly or knowingly. Plaintiffs' attempt to allege scienter simply by arguing in a conclusory fashion that the failure to disclose the shelf-stock adjustment practice was so outrageous that it had to have been done recklessly or knowingly. Even assuming that the Plaintiffs had fully fleshed out the bases on which they form their belief that such a practice took place and was not disclosed, this method of pleading runs afoul of § 21D(b)(2)'s requirement of pleading scienter with particularity. Plaintiffs essentially offer only two concrete facts underlying their allegations of scienter: (1) Defendants had a motive and opportunity to commit the fraud; and (2) Defendants' failure to disclose was in violation of GAAP. Even taken together, these allegations are insufficient.

Even under the Second Circuit's motive and opportunity test, it is not clear that the allegations of motive and opportunity here would suffice to establish scienter. Plaintiffs allege a concrete financial interest in misrepresenting IVAX's financial well-being only as to two Defendants: Klein, who allegedly was seeking to improve the value of his severance package, and Fishman, who sold $2,871,376 worth of IVAX common stock shortly before

the stock dropped in value, a motive that is somewhat undercut by the fact that that sale represented only about 5% of Fishman's IVAX stock holdings. Neither of those alleged motives goes very far in raising an inference that those Defendants knowingly or recklessly misrepresented IVAX's financial well-being. As to the remaining Defendants, the Plaintiffs can only cite the more general motives of maintaining the stock price in order to maintain the reputation of the company and facilitate mergers and acquisitions. Because such motives can be ascribed to virtually all corporate officers and directors, they fail to raise a strong inference of knowing or reckless conduct. Given that alleging motive and opportunity no longer automatically satisfies the scienter requirement, it is clear that these allegations fall short of what is required under the Court's reading of § 21D(b)(2).

Plaintiffs' allegations that the failure to disclose and maintain a reserve for shelf-stock adjustments violated GAAP also do not satisfy the pleading requirement for scienter. The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), held that the mental state necessary for a finding of culpability under § 10(b) was one embracing an intent to deceive, manipulate, or defraud. The Court there left open whether recklessness—not in the sense of gross negligence, but in the sense of "a form of intentional conduct"—could constitute such scienter. *Id.* at 193 n. 12, 96 S.Ct. 1375. Thus, when virtually every circuit court of appeals settled on recklessness as a sufficient mental state, it was clear that the courts were selecting a term "com[ing] closer to being a lesser form of intent than merely a greater degree of ordinary negligence." *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 793 (7th Cir.1997).

For this reason, the Fifth Circuit—the only circuit court found addressing the issue—held in *Fine v. American Solar King Corp.*, 919 F.2d 290, 297–298 (5th Cir.1990), that the failure to follow GAAP, without more, does not constitute scienter. *Accord Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020 (5th Cir.1996). This Court agrees that it is not sufficient for a plaintiff to state that because a defendant violated GAAP, the defendant knew or must have known that it was publishing materially false information. Such a violation, on its own, does not represent the extreme departure from the standards of ordinary care that the recklessness standard requires. *McDonald*, 863 F.2d at 814. Even when combined with the Plaintiffs' limited allegations of motive, the Plaintiffs' allegations of a GAAP violation do not give rise to a strong inference that the Defendants acted knowingly or recklessly. The Court therefore grants Defendants' motions to dismiss for failure to satisfy the requirements of § 21D(b)(2).

## H. Defendant Klein

The Court addresses separately the position of Defendant Klein to emphasize that the Plaintiffs' claims are on particularly shaky ground with regard to his participation in the alleged fraud. The Supreme Court has made abundantly clear that a private plaintiff may not maintain a § 10(b) suit against a defendant for aiding and abetting the fraudulent scheme. *See Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439. A person cannot be liable under § 10(b) unless that person employs a manipulative device or makes a material misstatement or omission on which a purchaser or seller of securities relies. *See id.* Plaintiffs have alleged that Klein knew about the scheme to inflate IVAX's sales through the shelf-stock adjustment plan, stood materially to gain from that scheme, and took every effort to increase IVAX's sales through such sales practices. These allegations alone fail to satisfy the *Central Bank* test as they nowhere allege that Klein employed a manipulative device or made a material misstatement. Thus, apart from the Plaintiffs' failure to satisfy the Reform Act's pleading requirements with respect to Defendant Klein, the Plaintiffs' failure to plead sufficient facts implicating Klein's participation in the fraud provides an alternative and independent basis for dismissal. Should the Plaintiffs amend their

**1362**

complaint with respect to Defendant Klein, they will need to plead facts comporting with the Supreme Court's *Central Bank* holding.

### I. Remaining Claims

Because the Court is dismissing the Plaintiffs' § 10(b) and Rule 10b–5 claims for failure to comply with the Reform Act's pleading requirements, the Plaintiffs' § 20(a) claims must also fail, *Enstar Group Inc.,* 84 F.3d at 397, and the Court will dismiss the remaining state law claim for negligent misrepresentation pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### J. Leave to Amend

■ Defendants urge the Court to dismiss the Plaintiffs' complaint with prejudice. However, the Court is not dismissing Plaintiffs' claim because of any defect in the legal theory under which the Plaintiffs proceed, but rather because the Plaintiffs have failed to plead sufficient facts pursuant to the Reform Act. Moreover, at oral argument, Plaintiffs' counsel sought leave to replead if the Complaint were dismissed, representing that additional particulars could be pleaded to repair any pleading deficiencies in the Complaint. Because the pleading requirements of the Reform Act are only just beginning to be fleshed out in the courts and the Plaintiffs had little way of knowing how this Court would interpret the requirements of § 21D(b), it would be unfair to deny leave to replead. *Accord In re Baesa,* 969 F.Supp. at 243. As discovery remains stayed, there is little prejudice to the Defendants.

### Conclusion

The language and legislative history of the Reform Act make clear that conclusory allegations of fraud coupled with allegations that the defendant had motive and opportunity to commit fraud are no longer sufficient to form the basis of a Section 10(b) claim. Facts underlying a plaintiff's belief that misrepresentations were made must be set forth with particularity. Moreover, the Reform Act now requires that a plaintiff state with particularity, with respect to each alleged misrepresentation, facts giving rise to a strong inference that the defendant acted recklessly or knowingly. The Complaint brought here fails on both counts. Accordingly, it is

ADJUDGED that Defendant Klein's Motion to Dismiss (**docket no. 73**) and Defendants IVAX, Frost, Fishman, and Fipps' Motion to Dismiss (**docket no. 71**) are GRANTED without prejudice. Plaintiffs shall have until no later than **September 30, 1998** to file, if possible, an amended complaint comporting with the legal principles set forth in this memorandum opinion. The Plaintiffs' failure to file an amended complaint by that date will result in the dismissal of this action with prejudice.