**Joseph C. HUBBARD, individually and on behalf of all other similarly situated, Plaintiff,**

v.

**BANKATLANTIC BANCORP, INC., James A. White, Valerie C. Toalson, John E. Abdo, Jarrett S. Levan and Alan B. Levan, Defendants.**

Case No. 07–61542–CIV.

United States District Court, S.D. Florida.

Dec. 12, 2008.

David Reich Chase, David R. Chase PA, Fort Lauderdale, FL, Jules Brody, Stull Stull & Brody, New York, NY, Julie Prag Vianale, Kenneth J. Vianale, Vianale & Vianale, Boca Raton, FL, for Plaintiff.

Eugene E. Stearns, Adam Michael Schachter, Gordon McRae Mead, Jr., Richard Bryan Jackson, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, FL, for Defendants.

## *ORDER ON MOTION TO DISMISS*

URSULA UNGARO, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Dismiss the Consolidated Amended Complaint, filed June 6, 2008 (D.E. 57), which Defendants later supplemented on October 22, 2008 (D.E. 68). Plaintiff responded in opposition to the Motion to Dismiss on July 21, 2008 (D.E. 63). Defendants replied on August 22, 2008 (D.E. 66). The matter is ripe for disposition.

THE COURT has considered the Motion, the pertinent portions of the record, and is otherwise fully advised in the premises.

### *Background*

This is a securities fraud class action brought against BankAtlantic Bancorp, Inc. ("BankAtlantic Bancorp") and several officers and board members of both BankAtlantic Bancorp and its wholly-owned subsidiary, BankAtlantic (collectively, the "Company"). Plaintiff asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, alleging that BankAtlantic Bancorp and the individual defendants knew, or were reck-

less in not knowing, about certain lending and accounting practices that the Company engaged in during the class period that artificially affected the value of BankAtlantic Bancorp's stock. This action was originally filed on October 29, 2007 (D.E. 1). The Consolidated Amended Complaint (the "Complaint") was filed on April 22, 2008 (D.E. 51), and is the subject of the present Motion to Dismiss.

### I. The Parties

Lead Plaintiff State–Boston Retirement System ("State–Boston")[1] brings these claims on behalf of a putative class of persons who purchased BankAtlantic Bancorp stock during the period from November 9, 2005 through October 25, 2007, inclusive (the "Class Period").

BankAtlantic Bancorp is a holding company that, through its wholly-owned subsidiary, BankAtlantic, offers consumer and commercial banking and lending services in Florida (Compl. ¶ 29.) The five individual defendants (collectively, the "Individual Defendants") either are or were senior officers or board members of the Company during the Class Period. (Compl. ¶ 39.) The Individual Defendants are as follows: (1) James A. White ("White"), former Executive Vice President and Chief Financial Officer ("CFO") of BankAtlantic Bancorp and former CFO of BankAtlantic; (2) John E. Abdo ("Abdo"), Vice–Chairman of the Board of Directors for BankAtlantic Bancorp and BankAtlantic, and a member of the Company's Major Loan Committee; (3) Valerie C. Toalson ("Toalson"), CFO of BankAtlantic Bancorp and Executive Vice President and CFO of BankAtlantic;[2] (4)

---

1. On February 4, 2008, the Court appointed State–Boston as the Lead Plaintiff. (D.E. 45.) State–Boston is an institutional investor claiming to have purchased shares in BankAtlantic BankCorp during the class period and

to have suffered over $1.8 million in losses. (*See* D.E. 45 at 5.)

2. Prior to becoming the Executive Vice President and CFO of BankAtlantic, Toalson

Jarrett S. Levan ("J. Levan"), former President and current Chief Executive Officer ("CEO") and Director of BankAtlantic, current President of BankAtlantic Bancorp, and a member of the Company's Major Loan Committee; and (5) Alan B. Levan ("A. Levan"), former Chairman of the Board and CEO of BankAtlantic Bancorp, BankAtlantic's former Chairman of the Board and President and CEO, and a member of the Company's Major Loan Committee. (*See* Compl. ¶¶ 30–34.)

Through direct and indirect holdings, Individual Defendants A. Levan and Abdo collectively possessed a controlling voting share of the Company at all times relevant to the Complaint.[3] (Compl. ¶ 38.)

## II. The Allegations [4]

During the Class Period, the Company sought to capitalize on the Florida real estate boom through expansion of its commercial real estate ("CRE") loan portfolio. (Compl. ¶ 4.) The Company cut corners in order to fuel rapid growth and secure customers for its CRE portfolio, including ignoring the Company's internal lending guidelines. (Compl. ¶ 6.) At the same time, the Company failed to adequately reserve for losses associated with its risky CRE loans, resulting in material misstatements in the Company's financials. (Compl. ¶ 11.) When the Florida real estate market entered a free fall in 2007, borrowers began defaulting on these CRE loans. (Compl. ¶ 14.) Ultimately, in October 2007, Defendants were forced to reveal the true extent of the Company's exposure

in its CRE portfolio—over $530 million— and this disclosure caused the Company's stock prices to drop. (Compl. ¶ 54.)

## A. Risky Commercial Loans and Lack of Internal Controls

There are three loan segments in the Company's CRE loan portfolio: Land Acquisition and Development ("LAD"); Land Acquisition Development and Construction ("LADC"); and Builder Land Bank ("BLB"). The loans comprising the three segments are inherently risky in part because they are secured by undeveloped land; consequently, the Company has property of little value to sell in the event of a default. (Compl. ¶ 53.) LAD loans are particularly risky because, according to a confidential witness, they are plagued with construction-related issues and because there are rarely development plans associated with these loans. (Compl. ¶ 87.) So, for instance, if a borrower-developer defaults after only half-developing the land, the Company has to find another developer to take the property and finish the development. (Compl. ¶ 87.)

Loans in these segments are made even more risky by virtue of the fact that they were approved during the Class Period notwithstanding obvious underwriting deficiencies. For example, confidential witnesses state that the Company engaged in the following lending practices during the Class Period when it came to the CRE loans:

served as Senior Vice President and CFO of BankAtlantic during the Class Period. (Compl. ¶ 32.)

**3.** BFC Financial Corporation was the beneficial owner of Class A and Class B shares in BankAtlantic Bancorp. (Compl. ¶ 36.) A. Levan and Abdo possessed a beneficial ownership in BFC Financial Corporation and also

personally held direct shares in BankAtlantic Bancorp. (Compl. ¶¶ 31, 34, 36.)

**4.** For purposes of this Motion to Dismiss, the Court takes the facts alleged in the Complaint as true. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir.1994). Accordingly, the Court will largely dispense with the use of "allegedly" in the following narrative.

- allowing *loan officers* to underwrite CRE loans, while other types of loans were underwritten by the Company's Credit Department (the department charged with investigating creditworthiness and mitigating risk) (Compl. ¶ 57);
- directing the Credit Department to fund CRE loans despite obvious underwriting deficiencies, such as lack of proper documentation, unsatisfied closing conditions, incomplete appraisals, etc. (Compl. ¶¶ 60–61, 64);
- only requiring the Credit Department to investigate the creditworthiness of CRE loan guarantors and not requiring an opinion as to the creditworthiness or technical aspects of the CRE loans themselves (Compl. ¶ 62); and
- engaging in "character lending" (*i.e.*, lending based on the familiarity with the borrower and his or her reputation or net worth in lieu of actual underwriting). (Compl. ¶ 63.)

Notwithstanding the fact that Defendants engaged in the above practices, Defendants repeatedly reassured investors during investor conference calls that the Company was adhering to conservative and prudent lending practices. (Compl. ¶¶ 146, 161, 164, 176.)

Confidential witnesses (all of whom are former employees) also state that the underwriting deficiencies in Company loans were clearly documented in internal reports titled "Exception Reports," which were circulated monthly to the Individual Defendants. (Compl. ¶ 65.) Additionally, Individual Defendants A. Levan and Abdo "were involved in every deal BankAtlantic made, especially the very large ones," and it was " 'common knowledge' that the Company had many large loans on its books that were likely subject to default and economic loss and for which reserves had not been taken." (Compl. ¶¶ 84–85.) According to another confidential witness, Defendants were aware of the riskiness of LADC loans because the "Company had experienced problems with them in the past." (Compl. ¶ 88.) Notwithstanding the risky nature of these loans, the lack of internal controls, and underwriting deficiencies, "most of these loans received rubber-stamp approval from the Major Loan Committee—a fact confirmed by Confidential Witness # 7 ("CW7") . . . who recalled from personal knowledge that most of the loans that were brought before the committee during CW7's employment were approved, and that the loan approval process at BankAtlantic did not begin to tighten until 2007." (Compl. ¶ 91.)

As an example of the Company's reckless lending practices, Plaintiff offers the Company's August 8, 2005 loan of $27.86 million to a venture called Steeplechase Properties LLC (the "Steeplechase Loan"). The value of the land securing the Steeplechase Loan had been artificially inflated through a straw transaction, and this overstatement of value was easily detectable through due diligence of public tax and criminal records. (Compl. ¶ 7.) The Company was not diligent, however, and made the Steeplechase Loan at the inflated value of $27.86 million and even though a $2 million escrow condition was not satisfied at closing. (Compl. ¶ 7, 75.) The borrower defaulted within months, and the Company repossessed the land. (Compl. ¶¶ 8, 77.) According to a confidential witness, Company executives "walked" the property in or around March or April 2006, and the Executive Vice President of Lending[5] concluded that it was not suitable for this action.

---

5. Marcia Snyder, the Executive Vice President of Lending, is not a named defendant in

development. (Compl. ¶ 81.) The Company later transferred the property to one of its subsidiaries at the inflated loan value in order to avoid having to write down the Steeplechase Loan as a loss. (Compl. ¶¶ 77, 81.) According to two confidential witnesses, the Steeplechase Loan was not an isolated occurrence, and the underwriting deficiencies in that loan were characteristic of the Company's practices with numerous other CRE loans in the BLB, LAD, and LADC segments. (Compl. ¶ 83.) The events surrounding the Steeplechase Loan were twice reported in the *Sarasota Herald–Tribune*. (Compl. ¶¶ 77, 82.)

Notwithstanding the Steeplechase Loan and the Company's CRE lending practices, the Company represented in three separate press releases that its "credit process has been conservative and consistent with [its] practices over the past several years during which [its] credit experience was excellent," and the CRE loans represent an area where "we remain very cautious in our credit management." (Compl. ¶¶ 161, 174, 187.)

Defendants never revealed to the public the scope of the potential risk of loss in the CRE portfolio, but only revealed a potential risk of loss in the BLB segment when market conditions forced them to do so. (Compl. ¶ 54.) When the Company's first quarter results for 2007 were weak, Defendants "attempted to limit the bad news on BankAtlantic's stock price by emphasizing the Bank's 'conservative' lending practices, and falsely stating that the Bank's CRE loan loss exposure was limited to only one (BLB) portfolio." (Compl. ¶¶ 54, 175, 177, 178.) Also, during a February 1, 2007 investor conference call, an analyst asked Defendants to "expand upon the Company's CRE portfolio and to also update investors on the Steeplechase loan." (Compl. ¶ 165.) Individual Defendant A.

Levan discussed the Steeplechase Loan but omitted to elaborate on the status of the Company's CRE portfolio as a whole. (Compl. ¶ 165.)

The Company again understated its exposure during a April 26, 2007 investor conference call. During this call, A. Levan stated that there was between $140–$160 million worth of outstanding loans in the Company's CRE portfolio, but did not reveal the additional exposure of $395 million worth of loans in LAD and LADC segments also in the CRE portfolio. (Compl. ¶ 176–77.) During the same call, White stated that the loans giving the Company the largest concern are the loans in the BLB segment. (Compl. ¶ 178.)

On July 24, 2007, the Company issued a press release that stated that the "Bank's Commercial Real Estate [CRE] loan portfolio ... totaled $1.4 billion," but only indicated concern with regard to the $135 million BLB segment of the portfolio. (Compl. ¶ 187.) The press release did not mention either the LAD or the LADC segments. The next day, during an investor conference call, the following discussion ensued:

> [ANALYST]: Basically, what I am trying to find—ask you is the $135 million in land loans that you guys are concerned about, *are there other portfolios*—and I am going to focus you on the construction portfolio—*that you feel there might be some risk down the road as well?*
>
> [A. LEVAN]: *There are no assets classes that we are concerned about in the portfolio as an asset class.* We've reported all the delinquencies that we have, which actually I don't think are any other than the ones that we've just reported to you. So the portfolio has always performed extremely well and continues to perform extremely well. And that's not to say that from time to

time there aren't some issues … *The one category that we just are focused on is this land loan builder [BLB] portfolio,* because just from one day to the next the entire home building industry went into a state of flux and turmoil, and is impacting that particular loss. But to our knowledge and in just thinking through, *there are no other particular asset classes that we're concerned about other than that one class.*

(Compl. ¶ 188 (emphasis added).)

## B. Inadequate Loan Reserves

The Company also failed to establish adequate reserves for loan losses during the Class Period, which had the effect of inflating its reported net income. (Compl. ¶ 102.) The Company's computation for loan loss reserves was based, in part, on its classification of loans. (Compl. ¶¶ 104, 105.) Loans in riskier categories required a higher reserve allowance than loans in less risky categories. (Compl. ¶ 104.) According to a confidential witness, "Bank employees intentionally mischaracterized loans into less risky categories, particularly categorizing loans that should have been in the LAD portfolio into other categories to justify smaller reserves, thus protecting the bottom line." (Compl. ¶¶ 68, 104.)

A. Levan stated during a July 25, 2007 investor conference call that the Company was continuing to build its reserve and was closely monitoring the real estate portfolio. (Compl. ¶ 107.) During an April 26, 2007 investor conference call, Toalson referenced the reserve calculations as "prudent." (Compl. ¶ 107.) Meanwhile, the Company's loan loss reserves (or "allowances for losses"), measured as a percentage of such non-accrual loans,[6] decreased while the Company's non-accrual loans increased. (Compl. ¶¶ 108, 113.)

---

6. Non-accrual loans are impaired loans that are 90–day plus delinquent and are not gener-

## C. Individual Defendants A. Levan's and Abdo's Sales of Shares

Before the Company's weak financials were released in April 2007, Individual Defendants A. Levan and Abdo sold shares of Company stock collectively worth over $7.8 million. (Compl. ¶ 208.) Specifically, the parties made trades between February 10, 2006 to December 28, 2006 of 573,572 shares. (Compl. ¶ 208.)

## D. Fall in Stock Prices

On October 25, 2007, the Company issued a press release reporting its financial results for the third quarter of 2007. The press release announced a substantial net loss of $26 million (compared to $2.5 million in the prior year), which was attributed to poor conditions in the Florida real estate market. (Compl. ¶ 194.) The press release also revealed a substantial deterioration in the credit quality of the Company's CRE portfolio. (Compl. ¶ 195.) In particular, non-performing loans increased from $21.8 million at June 20, 2007 to $165.4 million at September 30, 2007. (Compl. ¶ 195.) Also, the Company announced a substantial increase in the Company's allowance for loan losses. (Compl. ¶ 196.)

Finally, for the first time, the Company revealed that it believed it had exposure in all three segments of its CRE portfolio. (Compl. ¶ 197.) Specifically, the press release stated that the Company's CRE portfolio totaled $1.3 billion. (Compl. ¶ 197.) This total number was less than the total reported in the Company's July 24th press release, which was $1.4 billion. (*See* Compl. ¶ 187.) However, the October 25th press release continued by stating that the "categories within this 'Commer-

---

ating interest or principal income. (Compl. ¶ 112.)

cial Residential' portfolio where we believe we have exposure to the declines in the real estate market are" the BLB, LAD, and LADC portfolios, which aggregate $149.3 million, $218.5 million, and $165.3 million, respectively. (Compl. ¶ 197.)

A few days later, an independent investment research firm, Morningstar, downgraded the Company's stock from 5 stars to 3 stars. (Compl. ¶ 199.) Morningstar called the Company's disclosure of its exposure in the LAD and LADC segments a "revelation of nearly 4 times as much in questionable loans" and stated that it believed "management took a large concentrated risk, putting the bank in harm's way, and an investment in BankAtlantic is now speculative at best." (Compl. ¶ 199.) The Company's stock dropped 38% following the press release, from a close of $7.63 on October 25, 2007 to a close of $4.71 the next day. (Compl. ¶ 200.) In total, the Company's stock price decreased from a Class Period high of over $15 per share to less than $5 per share. (Compl. ¶ 23.)

## III. Plaintiff's Claims

Plaintiff alleges that beginning in November 9, 2005 (the start of the Class Period), the Defendants' SEC filings and statements made during investor conference calls contained material misrepresentations or omissions because the Company "1) misrepresented and failed to disclose the existence of a highly concentrated portfolio of $530 million of the at-risk, under collateralized land development loans in the BLB, LAD, and LADC portfolios approved by defendants A. Levan, Abdo and other key executives in their capacity as members of the [Company's] Major Loan Committee; 2) failed to disclose that Defendants placed an enormous bet on high-risk loans to speculators, developers, and homebuilders hoping to capitalize on the Florida real estate boom; 3)

failed to disclose that Defendants recklessly and/or knowingly disregarded the Bank's stated underwriting guidelines when making the BLB, LAD and LADC loans, thus compounding the risk of the Bank's risky lending strategy; 4) misrepresented the adequacy of the Bank's loan loss reserves when they were actually materially understated; and 5) misrepresented that the Company's financial statements complied with GAAP." (Compl. ¶¶ 93, 119, 136, 143, 155, 172, 186.)

As a result of these omissions and misrepresentations, Plaintiff alleges that BankAtlantic Bancorp's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the putative class purchased or otherwise acquired securities relying upon the integrity of the market price of BankAtlantic's securities and have been damaged thereby. (Compl. ¶ 216.) Further, Plaintiff alleges that the Individual Defendants were control persons within the meaning of the Exchange Act and that Lead Plaintiff and other members of the putative class suffered damages as a direct and proximate result of their wrongful conduct. (Compl. ¶ 227.) Finally, Plaintiff alleges that Defendants' concealment of the risky nature of the loan portfolios allowed Individual Defendants A. Levan and Abdo to sell their own shares at a premium, and that Lead Plaintiff and other class members purchased BankAtlantic Bancorp shares contemporaneously with A. Levan and Abdo's sales during the Class Period. (Compl. ¶¶ 92, 230.)

## Standard of Review

### I. Motion to Dismiss

In order to state a claim, Federal Rule of Civil Procedure 8(a) (2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the claim is and the grounds

upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). At this stage of the litigation, the Court must consider the allegations contained in the plaintiff's complaint as true, and accept all reasonable inferences therefrom. *Jackson v. Okaloosa County, Fla.,* 21 F.3d 1531, 1534 (11th Cir.1994). However, surviving a Rule 12(b)(6) motion "requires more than labels and conclusions ... [f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 127 S.Ct. at 1965. "The Supreme Court's most recent formulation of the pleading specificity standard is that 'stating such a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir.2007). This rule does not impose a probability requirement at the pleading stage, but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary elements. *Id.* at 1296 (citing *Twombly,* 127 S.Ct. at 1965). Thus, the "main Rule 8(a) standard now seems to be whether the allegations plausibly suggest [ ] ([and are]) not merely consistent with" a violation of the law. *Davis v. Coca–Cola Bottling Co. Consolidated,* 516 F.3d 955, 974 n. 43 (11th Cir.2008).

## II. The Securities Exchange Act

### A. Causes of Action

Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder. Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (2000).

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2007).

▮ In order to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege the following: (1) the defendant made misstatements or omissions, (2) of a material fact, (3) with scienter, (4) on which plaintiff relied, (5) that proximately caused plaintiff's injury. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1281 (11th Cir.1999); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001). To prove the causation element, the plaintiff must show both (1) that the misrepresentations or omissions caused them to en-

gage in the transaction in question ("transaction causation") and (2) that the fraud was in some proximate way responsible for their loss ("loss causation"). *See Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997) (citations omitted).

■ In addition to claims under Section 10(b) and Rule 10b–5, Plaintiff also puts forth claims against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). This section provides for joint and several liability of any persons who had the "power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir.1996). Plaintiff carries the burden of showing that a defendant is a controlling person. *Id.* A plaintiff cannot adequately plead violations of Section 20(a) without adequately pleading the primary violations. *Id.* at 396–97; *Druskin v. Answerthink, Inc.,* 299 F.Supp.2d 1307, 1339 (S.D.Fla.2004) (citing *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1351 (S.D.Fla.1998)).

Finally, Plaintiff also puts forth claims against Defendants A. Levan and Abdo under Section 20A of the Exchange Act, 15 U.S.C. § 78t–1, which creates insider trading liability. More specifically, this section creates a private right of action against any "person who violates any provision of this chapter or the rule or regulations thereunder by purchasing or selling a security while in possession of material, non-public information ... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... or sold ... securities in the same class." 15 U.S.C. § 78t–1(a).

## B. Standard of Review for Federal Securities Fraud Cases

### (i) Expanded Evidence Considered

■ Normally, a court must limit its consideration on a motion to dismiss to the pleadings and written instruments attached as exhibits thereto; however, where a complaint alleges violations of securities laws, the court may consider certain other materials, such as documents incorporated by reference into the complaint and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). Courts may consider materials that are incorporated by reference into a complaint without converting a motion to dismiss to a motion for summary judgment if the document is (1) central to plaintiff's claim and (2) undisputed. *Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir.2005) (holding district court did not err by considering a contract central to the dispute without converting the motion to a motion for summary judgment); *see also Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999) (recognizing the incorporation by reference doctrine in a securities case). Additionally, the Eleventh Circuit has expressly held that a court may judicially notice relevant documents legally required by, and publicly filed with, the Securities and Exchange Commission ("SEC"). *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276–81 (11th Cir.1999). As the Eleventh Circuit stated, the "usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in context." *Harris v. Ivax Corp.,* 182 F.3d 799, 802, n. 2 (11th Cir.1999).

In this case, Defendants filed transcripts of BankAtlantic Bancorp's investor conference calls as attachments to their Motion to Dismiss and their Reply brief. (*See*

D.E. 58 (transcript for conference call held on Apr. 27, 2007 conference call); D.E. 66 (transcripts for conference calls held on July 20, 2006, Oct. 19, 2006, and Feb. 1, 2007).) Defendants have also attached many of the BankAtlantic Bancorp's and Individual Defendant's SEC filings.[7]

■ In deciding the instant Motion to Dismiss, the Court has considered the allegations of the Complaint, as well as the contents of relevant SEC filings and documents incorporated into the Complaint. Accordingly, the Court has considered the transcripts of the investor conference calls because, as discussed more fully below, Plaintiff's Complaint relies on the statements made during these conference calls. The fact that these transcripts are not attached to the Plaintiff's Complaint is not dispositive. *See Day*, 400 F.3d at 1276 ("The document need not be physically attached to a pleading to be incorporated by reference into it."). Additionally, the Court notes that Plaintiff did not object in his Response (or in any other filing with the Court) to Defendants' proffer of the transcripts or Defendants' reliance on the transcripts in their Motion to Dismiss, nor has Plaintiff challenged the authenticity of these transcripts.

### (ii) Heightened Pleading Requirements Under the PSLRA

Ordinarily, a complaint is adequate if it meets Fed.R.Civ.P. 8(a)(2)'s requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief." Securities fraud claims, however, have always been subject to Fed. R.Civ.P. 9(b)'s heightened pleading requirements. Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circum-

stances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other condition of mind of a person shall be averred generally." Fed.R.Civ.P. 9(b). The Eleventh Circuit has stated that Rule 9(b)'s fraud particularity requirement is met as long as the complaint sets forth "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citation omitted).

In 1995, Congress passed the Private Securities Litigation Reform Act of 1995, Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4(b) ("PSLRA"), which made two notable changes to the pleading requirements for securities fraud actions. First, the PSLRA slightly altered Rule 9(b)'s particularity requirement by mandating that a securities fraud action complaint

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1)(B). Thus, the PSLRA requires greater specificity than Rule 9(b). *Druskin*, 299 F.Supp.2d at 1321.

■■ Second, the PSLRA raised the standard for pleading scienter; a plaintiff

---

**7.** For example, Defendants have attached Form 4's (Statements of Changes in Beneficial Ownership) filed by Abdo, A. Levan, J.

Levan, and Toalson that show their personal stock trades during the Class Period.

can no longer plead scienter generally. The plaintiff must, for each alleged misrepresentation, "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). "Moreover, the complaint must allege facts supporting a strong inference of scienter for *each defendant* with respect to *each violation.*" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir.2008) (emphasis added) (citing *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir.2004)). The Court must dismiss the action if either of these two pleading requirements are not met. *Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1321 (S.D.Fla.2004).

## Analysis

In their Motion to Dismiss, Defendants argue that the Complaint should be dismissed for three reasons: (1) Plaintiff does not adequately plead with specificity material misrepresentations or omissions (*i.e.*, fraud); (2) Plaintiff's allegations fails to satisfy the demanding standard for pleading scienter; and (3) Plaintiff fails to adequately plead loss causation. The Court will examine each of these in turn.

## I. Particularized Allegations of Fraud

The gravamen of Plaintiff's Complaint is that there was substantially more risk in the Company's CRE portfolio than Defendants publicly disclosed, and that Defendants' failure to disclose the extent of risk kept the Company's stock prices artificially high. To that end, Plaintiff alleges Defendants made the following series of misrepresentations and omissions: (i) Defendants only disclosed that the BLB portfolio was at risk when forced to do so, but omitted to disclose that the LAD and LADC portfolios were similarly risky; (ii) Defendants engaged in risky lending prac-

tices and ignored internal lending guidelines while stating they were conservative lenders; and (iii) Defendants misrepresented the adequacy of their loan loss reserves.

Defendants' first argument in their Motion to Dismiss is that Plaintiff has failed to adequately plead fraud. (Mot. 9–14.) For example, Defendants argue in their Motion to Dismiss that Plaintiff's repeated allegations that Defendants "misrepresented and failed to disclose the existence of a highly concentrated portfolio of $530 million of at-risk, undercollateralized land development loans" are conclusory and fail under the PSLRA and Rule 9(b). (Mot. 10.) Defendants argue that Plaintiff may not rely on such "make-weight words and phrases" and that Plaintiff fails to specify which loans were risky, when they became risky, whether any Defendants knew they were risky, and when disclosure of these risky loans was required. (Mot. 9–10.) Defendants also argue that Plaintiff's contentions as to the Company's reckless lending practices are similarly inadequate because Plaintiff does not specify the extent of the offending practices, what loans were wrongly approved or became impaired as result of these lending practices, or what loans were written off or written down as a result of Defendants' lending practices. (Mot. 11.) Additionally, Defendants argue that there are no particularized allegations connecting any particular Defendant with the setting of reserves; instead, "the assertions regarding understated loan loss reserves are nothing more than an argument that Defendants should have more accurately predicted the future." (Mot. 12.)

The Court finds that Plaintiff's Complaint alleges misrepresentations and omissions in a manner sufficient to withstand a motion to dismiss. The Complaint sets forth in detail and with particularity

the loans that were inherently risky (*e.g.*, loans in the BLB, LAD, and LADC segments), why they were risky (*e.g.*, approved notwithstanding underwriting deficiencies and secured by undeveloped land), what lending practices contributed to the undisclosed risk (*e.g.*, approving loans before satisfaction of closing conditions), what statements were materially false (*e.g.*, statements during investor conference calls that the Company was a conservative lender), why such statements were false (*e.g.*, the Company was lending to borrowers without properly investigating their creditworthiness), and what the Defendants stood to gain in making the statements (*e.g.*, artificially high stock prices allowed Individual Defendants to sell their stocks at a premium). Moreover, Plaintiff identifies the sources of the facts alleged, such as the Company's former employees [8] and articles published in the *Sarasota Herald–Tribune.* Plaintiff pled the "who, what, when, where, and how." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir.2006) ("A sufficient level of factual support for a[10b] claim may be found where the circumstances of the fraud claim are pled in detail. This means the who, what, when, where and how: the first paragraph of a newspaper story." (citation and quotation omitted)). Accordingly, the Court finds that the allegations of fraud in the Complaint satisfy the heightened pleading requirements under the PSLRA and Rule 9(b).[9]

**8.** Defendants argue that Plaintiff's confidential witnesses allegations are inconsistent with *Tellabs*, 127 S.Ct. 2499 (2007) and should be disregarded as a matter of law. (Mot. 13) (citing *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 552 (5th Cir.2007).) This argument was rejected by the Eleventh Circuit in *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir.2008), which was decided after Defendants filed their Motion to Dismiss. As the *Mizzaro* decision squarely holds that confidential witnesses may be used in securities fraud actions and sets forth a standard for weighing statements made by such witnesses, the Court finds it more appropriate to address the issue of confidential witnesses in its discussion regarding scienter *infra.*

**9.** Defendants argue that the Complaint improperly relies on the group pleading doctrine, which is a presumption of group responsibility for statements and omissions in order to satisfy the particularity requirements for pleading fraud under Rule 9(b). *See Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir.2004). As the Supreme Court recently recognized, there is a disagreement among the Circuits as to whether this doctrine survives in the wake of the PSLRA. *Tellabs*, 127 S.Ct. at 2511 n. 6. In 2004, the Eleventh Circuit stated it had not yet decided whether the group pleading doctrine is viable under PSLRA and Rule 9(b). *Phillips*, 374 F.3d at 1018–19 (recognizing that the viability of the group pleading doctrine in the wake of the PSLRA is debatable).

Meanwhile, many district courts in this Circuit have held that the doctrine does apply post-PSLRA. *See, e.g., Sides v. Simmons*, 2007 WL 2819371, *4 (S.D.Fla. Sept. 24, 2007) (collecting cases); *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1341 (S.D.Fla. 1999); *Druskin v. Answerthink*, 299 F.Supp.2d 1307, 1322 (S.D.Fla.2004) (same); *but see In re Premiere Techs. Inc. Sec. Litig*, No. 1:98–CV–1804–JOF, 2000 WL 33231639, * 11 (N.D.Ga. Dec. 8, 2008) (holding that the doctrine does not survive PSLRA). Defendants recognize this, but state in a footnote that the Eleventh Circuit is likely to reject the doctrine. (Mot. 15 n. 14.) The Court assumes for the purposes of this Motion that the doctrine applies. *See, e.g., In re Miva, Inc. Sec. Litig.*, 511 F.Supp.2d 1242 (M.D.Fla.2007) (recognizing that the viability of the doctrine is undecided in the Eleventh Circuit but applying the doctrine for the purpose of considering the motion to dismiss). Thus, it is not necessary for Plaintiff to set forth a specific connection between each individual corporate defendant and every alleged omission or misrepresentation when the allegedly misleading information is contained in group published information. *See In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d 1291, 1299–1300 (S.D.Fla.2002). It is important to note, however, that while this doctrine may apply as to

## II. Particularized Allegations of Scienter

 Defendants' second argument in their Motion to Dismiss is that the Complaint fails to meet the demanding standard for pleading scienter imposed by the PSLRA. (Mot. 15–19.) As stated above, a plaintiff must, for each alleged misrepresentation, *"state with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). "Thus, beyond the who, what, when, where and how of the alleged fraud, a complaint pleading securities fraud must also plead the mens rea of the cause of action with specificity." *In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d 1353, 1370 (S.D.Fla.2001). Further, the "complaint must allege facts supporting a strong inference of scienter for *each defendant* with respect to each violation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir.2008) (emphasis added) (citation and quotation omitted).[10]

 The Supreme Court has defined the level of scienter necessary to support a securities fraud claim as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Eleventh Circuit, proof that defendants acted with severe recklessness also satisfies the scienter requirement. *Bryant*, 187 F.3d at 1282–84. Severe recklessness is limited to

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981).[11]

 The Supreme Court has recently clarified what is meant by a "strong inference" of scienter under the PSLRA. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court held that a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 127 S.Ct. at 2510. It is an inherently comparative inquiry because a court not only looks at whether the pled facts give rise to a strong inference of scienter, but also takes into account any opposing inferences. *Id.* at 2509–10. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter as least as strong as any opposing inference?" *Id.* at 2511.[12] Thus,

---

Rule 9(b)'s particularity requirements, it does not apply to the PSLRA's scienter requirements. *See Sunbeam*, 89 F.Supp.2d at 1341; *Druskin*, 299 F.Supp.2d at 1322. This distinction is an important one and will be discussed in more detail in the Court's discussion regarding scienter *infra*.

10. Accordingly, the group pleading doctrine does not apply to the PSLRA's scienter requirements. *See* note 6 *supra*. Therefore, it is necessary for the Court determine whether Plaintiff's properly adequately plead scienter as to *each* Defendant.

11. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

12. The Eleventh Circuit in *Mizzaro* pointed out that the "strong inference" standard under *Tellabs* is different from the summary judgment standard because it asks what a reasonable person *would* think, not what a reasonable person *could* think. *Mizzaro*, 544 F.3d at 1239 (*comparing Tellabs*, 127 S.Ct. at 2510 *with Anderson v. Liberty Lobby, Inc.*, 477

the Court does not scrutinize each of Plaintiff's allegations in isolation, but rather assesses all of the allegations holistically. *Id.*

## A. Confidential Witnesses

■ Before the Court embarks on a comparative assessment of the plausible inferences of scienter, it must first discuss how it will evaluate the allegations based on statements made by unidentified, confidential witnesses. The issue is especially important here because Plaintiff's allegations about (i) the Company's allegedly risky lending practices, (ii) the inherently risky nature of the Company's CRE loans, and (iii) the mischaracterization of CRE loans in less risky categories to avoid having to increase the Company's loan loss reserves, substantially rest on statements made by confidential witnesses.

The Eleventh Circuit has recently addressed how a court should evaluate confidential sources. In *Mizzaro v. Home Depot, Inc.,* the Eleventh Circuit noted that courts may be skeptical of confidential sources cited in securities fraud complaints, but declined to adopt a *per se* rule requiring that a securities fraud complaint always name a confidential source, "*so long as* the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." 544 F.3d 1230, 1239–40 (11th Cir.2008) (emphasis added). The Eleventh Circuit continued, holding that "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that the courts may consider ... [c]onfidentiality, however, should not

eviscerate the weight given *if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.*" *Id.* at 1240 (emphasis added).

The Complaint relies on seven confidential witnesses. (*See* Compl. ¶¶ 56–91.) Each of these sources is described as a "former employee with specific and detailed knowledge about the Bank's CRE lending practices and underwriting procedures during the Class Period." (Compl. ¶¶ 56, 57, 62, 73, 84, 91.) There is no specific information as to the confidential witnesses' positions in the Company, their employment duties, the foundation or basis for their knowledge, or whether they were even employed with the Company during the relevant times in the Complaint. With the exception of two of the seven confidential witnesses, the Complaint does not even state in what department they worked. (*See* Compl. ¶ 62 (stating that Confidential Witnesses #1 and #2 were former members of the Company's Credit Department).) Thus, for the majority of the confidential witnesses, it is not even possible to discern their proximity to the offending conduct. *See Mizzaro,* 544 F.3d at 1240 (holding that the complaint provided an adequate foundation for the witnesses' statements where it described their positions in the defendant's business, which might have exposed them to the alleged fraudulent practices). In short, the Complaint fails to "unambiguously provide[ ] in a cognizable and detailed way the basis of the whistleblower's knowledge." *Id.* at 1239–40.[13] Accordingly, the Court is un-

U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**13.** Plaintiff all but concedes that the Complaint contains insufficient information re-

garding the confidential witnesses. Plaintiff states that he has chosen to not plead "all available information concerning job titles, locations, and starting and ending dates of employment *when providing such information*

able to give any significant weight to the allegations based on statements made by these confidential witnesses.

## B. Pleading Scienter

As stated earlier, the PSLRA requires a plaintiff to "statement with particularity facts giving rise to a strong inference" of scienter for each alleged misrepresentation. 15 U.S.C. § 78u–4(b)(2). Also, the "complaint must allege facts supporting a strong inference of scienter for *each defendant* with respect to *each violation.*" *Mizzaro,* 544 F.3d at 1238 (emphasis added) (citation and quotation omitted); *see also Sunbeam,* 89 F.Supp.2d at 1341 (holding that the group pleading doctrine survives the PSLRA as to Rule 9(b)'s particularity requirements, but does not apply to the PSLRA's scienter requirements); *Druskin,* 299 F.Supp.2d at 1322 (same). Accordingly, the Court will look at the factual allegations made with respect to each Defendant and determine whether those facts support a strong inference that each Defendant acted with severe recklessness or with the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

### (i) Abdo, A. Levan, and J. Levan

 Abdo, A. Levan, and J. Levan each served on the Company's Major Loan Committee, which was responsible for reviewing and approving each CRE loan in excess of $3 million. (Compl. ¶¶ 16, 59.)

Plaintiff alleges that because these three Individual Defendants served on the Major Loan Committee, they had knowledge of, or consciously disregarded, the Company's reckless lending practices.[14] (Compl. ¶ 203.) Also, Abdo, A. Levan, and J. Levan are alleged to have knowledge of, or to have consciously disregarded, these reckless lending practices because they received monthly "Exception Reports," which detailed missing loan documentation, any other unsatisfied underwriting criteria, and whether a lending policy had been overridden in the making of a loan. (Compl. ¶¶ 65, 203.) According to a confidential witness, "it was common practice during the Class Period for the Major Loan Committee (including defendants A. Levan, Abdo, and J. Levan) to override the Credit Department and direct that loans be funded anyway despite obvious underwriting deficiencies." (Compl. ¶ 61.) Another confidential witness stated that A. Levan and Abdo "were involved in every deal BankAtlantic made, especially the very large ones," and it was " 'common knowledge' that the Company had many large loans on its books that were likely subject to default and economic loss and for which reserves had not been taken." (Compl. ¶¶ 84–85.) A similarly conclusory allegation was supplied by another confidential witness "who recalled from personal knowledge that most of the loans that were brought to the [Major Loan Commit-

---

*would be tantamount to revealing the witnesses' identity."* (Resp. 16 n. 1 (emphasis added).) Notwithstanding this qualification, the Court notes that Plaintiff *never* provided such information for *any* witness. Plaintiff states that it will provide such information to the Court *in camera* if the Court so requests, but the Court is not persuaded that providing information in this manner would be appropriate under the PSLRA.

**14.** The Court notes that the Complaint does not allege that Abdo, A. Levan, and J. Levan were members of the Major Loan Committee throughout the Class Period, or that A. Levan remained a member after he ceased serving as President of BankAtlantic Bancorp Inc. and the CEO of BankAtlantic on January 16, 2007. However, the Court assumes for purposes of this Order that Abdo, A. Levan, and J. Levan were members of the Major Loan Committee at all times relevant in the Complaint.

tee] ... were approved, and that the loan approval process at BankAtlantic did not begin to tighten until 2007." (Compl. ¶ 91.) Finally, the Complaint alleges that by virtue of their high level positions in the Company, these Defendants "directly participated in the management of the Company, [were] directed involved in the day-to-day operations of the Company and its business, operations products, growth, financial statements and financial condition ...." (Compl. ¶ 41.)

The Court finds that these factual allegations, taken together, do not give rise to a strong inference of scienter. Two of the above allegations rest on confidential witness statements, which the Court has already stated will not be accorded any significant weight. However, assuming that these statements could be given weight, they are insufficient to create a strong inference of scienter. The confidential witness's vague and conclusory assertion that it was "common knowledge" that the Company had risky loans on its books is not the type of particularized allegations required under the PSLRA. The other confidential witness statement regarding the fact that the loan approval process did not begin to tighten until 2007 is especially unhelpful because the Class Period *includes* much of the year 2007.[15]

 Additionally, allegations that Abdo, A. Levan, and J. Levan had knowledge of the Company's lending or accounting practices by virtue of their high-level positions in the Company does not create a strong inference of scienter. "[M]ere allegations that Defendants held senior management positions, had access to inside information, and therefore, must have known of the falsity of certain statements is insufficient to plead scienter." *Smith Gardner*, 214 F.Supp.2d at 1303; *see also*

*Sunbeam*, 89 F.Supp.2d at 1342 (membership on an audit committee and receipt of an incentive-based compensation plan insufficient to establish scienter). Because allegations such as these "can be ascribed to virtually all corporate officers and directors, they fail to raise a strong inference of knowing or reckless conduct." *Sunbeam*, 89 F.Supp.2d at 1341 (citation and quotation omitted)

Moreover, the Court is not persuaded that a strong inference of scienter arises from the fact that Abdo, A. Levan, and J. Levan received monthly Exception Reports because the Complaint does not state what these Exception Reports contained during the Class Period. For example, the Complaint avers that Marcia Snyder would direct a Company employee to make loan disbursements before appraisals were complete and before all loan documents were compiled for closing, which violated Company policy. (Compl. ¶ 64.) According to a confidential witness, "these underwriting deficiencies were clearly documented in internal reports maintained by the Bank titled Exception Reports ... [which] detailed missing documentation and any other underwriting criteria not satisfied." (Compl. ¶ 65.) This factual allegation, however, has no temporal context. Thus, the alleged loan deficiencies resulting from Marcia Snyder's direction could have been contained in Exception Reports that were circulated before, during, or after the Class Period.

The only other factual allegation about what may have been contained in these Exception Reports is made in reference to the Steeplechase Loan. The Complaint alleges that "an Exception Report was generated the very first day the [Steeplechase Loan] was funded" and that it "specifically noted that the escrow monies were never received and the loan was

---

**15.** The Class Period ends on October 25, 2007.

non-recourse." (Compl. ¶ 76.) But Plaintiff fails to recognize that the Steeplechase Loan was made *before* the Class Period.[16] Thus, the fact that any of the Individual Defendants may have received an Exception Report *before* the Class Period regarding the Steeplechase Loan does not create a strong inference that those Defendants were severely reckless or acting with the intent to deceive, manipulate, or defraud Plaintiff *during* the Class Period. Indeed, the Complaint does not allege that Defendants received Exception Reports that detailed loans approved under allegedly lax underwriting practices during the Class Period, only that the Steeplechase loan was not an isolated occurrence but indicative of the Defendants' broader course of conduct.

In sum, factual allegations that Abdo, A. Levan and J. Levan received Exception Reports say nothing about what these Defendants knew or should have known about the Company's lending practices and the status of the CRE loans during the Class Period because there is no information about what the Exception Reports actually contained during that time. Further, allegations that Abdo, A. Levan and J. Levan sat on the Major Loan Committee, received the Exception Reports and were involved in the management of the CRE portfolio may demonstrate negligence as to their monitoring of the Company's lending practices, but in this case the PSLRA requires a much greater degree of culpability: extreme recklessness in the making of loans and the disclosure of risk.

■ Next, the Court considers whether Plaintiff's allegation that during the Class Period, A. Levan and Abdo sold shares of Company stock collectively worth over $7.8 million creates a strong inference

of scienter. (Compl. ¶ 208.) A. Levan and Abdo's sales of stock, when coupled with other evidence, may be probative of scienter if the sales were done in suspicious amounts or at suspicious times. *Smith Gardner*, 214 F.Supp.2d at 1303 (citing *S.E.C. v. Adler*, 137 F.3d 1325, 1340 (11th Cir.1998)). "In determining whether stock sales are unusual or suspicious, a court may look to: (1) the amount and percentage of shares sold; (2) the consistency between the sales and the insider's prior trading history; and (3) the consistency between the sales and the insider's prior trading history." *Id.* Plaintiff, however, does not allege that the amount or percentage of shares sold by Abdo and A. Levan were unusual, nor does Plaintiff allege that these sales were inconsistent with their prior trading history. Plaintiff merely alleges the aggregate amount of shares sold and the value of those shares.

■ Plaintiff appears to suggest that insider stock sales are inherently suspicious and, therefore, carry a strong inference of scienter. But insider stock sales are not inherently suspicious; stock sales only become suspicious when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re the Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002). Moreover, any inference of scienter from these sales is diminished by the fact that the shares sold during this period represent only a fraction of A. Levan and Abdo's holdings. (Mot. 18.) In fact, A. Levan and Abdo exercised options that resulted in a substantial *net increase* in their holdings during the Class Period. (*Id.*) Accordingly, the Court is not per-

---

16. The Steeplechase Loan was made on August 8, 2005, and the Class Period begins November 9, 2005.

suaded that Abdo and A. Levan's insider sales of create a strong inference of scienter as these two Individual Defendants.[17]

 Finally, the Court considers the factual allegation that Abdo had been confronted with the fraud and, therefore, acted with scienter. According to a confidential witness, the Company was headed for trouble on account of its risky lending practices, and "Defendants knew the kind of loans that were going on the books." (Compl. ¶ 85.) This confidential witness "brought this observation to the attention of defendant Abdo to no avail." (*Id.*) Yet, it is impossible to tell what "observation" was exactly brought to Abdo's attention, or the content of this conversation, or even when this conversation occurred. Consequently, this allegation is not sufficiently particularized for the Court to infer scienter as to Abdo.

In sum, the Court finds that when viewing all of these allegations as whole they are insufficient to create a cogent and compelling inference that Abdo, A. Levan, and J. Levan committed inexcusable negligence and engaged in an extreme departures from the standards of ordinary care.

### (ii) Toalson and White

The Complaint attributes numerous misleading statements to Toalson and White, but does not contain factual allegations that would support a finding that these statements were made with the requisite scienter. *See In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d 1297 (N.D.Ga. 2006) ("A complaint alleging securities fraud must provide *factual basis* for allegations of scienter." (emphasis added)). For example, the Complaint does not contain any particularized allegations that Toalson and White played a role in approving the Company's CRE loans or in setting the Company's loan loss reserves. *See id.* (noting that the complaint did not contain any instances in which the defendants were present at any of the meetings where the alleged fraud was discussed). The Complaint also does not allege that Toalson and White were presented with information that would have shown the falsity of the Company's financial statements or that they were confronted with concerns regarding the Company's lending practices or loan loss reserves.

Instead, the only factual basis asserted that would support Plaintiff's allegations that Toalson and White acted with the requisite scienter is that they had access to certain information due to their high-level positions in the Company and that, as Bank Executives, they also received Exception Reports. The Court finds, for the reasons stated above in its discussion regarding Abdo, A. Levan and J. Levan, that these vague and conclusory allegations do not raise a strong inference of scienter.[18] As such, the Complaint fails to allege sufficient facts to raise a strong inference of scienter as to Toalson and White.

### (iii) BankAtlantic

 It well established that scienter of a corporation's officer may be imputed to

---

**17.** The Court notes that any possible inference of scienter from these insider sales cannot be imputed on the remaining Individual Defendants White, Toalson, and J. Levan—none of whom are alleged to have engaged in any sales of stock during the Class Period.

**18.** For example, because the Complaint does not state what the Exception Reports actually contained during the Class Period, the Court cannot find that Toalson acted with the requi-

site scienter when she stated that the Company's reserve calculations were "prudent." (Compl. ¶ 107.) The Court also notes that while the Complaint alleges that Toalson, along with White and A. Levan, "attempted to limit the bad news ... by emphasizing the Bank's 'conservative' lending practices," no misleading statements were specifically attributed to Toalson. (*See* Compl. ¶¶ 175, 179, 180.)

the corporation itself under general agency and corporate law principles. *Druskin,* 299 F.Supp.2d at 1322. The Court has found, however, that Plaintiff has not adequately pled scienter as to any of the Individual Defendants; therefore, Plaintiff has failed to adequately pled scienter as to BankAtlantic.

### (iv) Remaining Allegations Fail to Create a Strong Inference of Scienter

The Court is mindful that the Complaint contains numerous other allegations that may create an inference of scienter, but finds that these allegations are not connected to any of the Individual Defendants such that the Court can infer scienter for any of them. Instead, the remaining allegations are vague and conclusory, resting in large part on statements made by confidential witnesses.

For example, most of the allegations concerning the Company's disregard for its usual lending guidelines are supported by statements made by Confidential Witness # 1, a former member of the Credit Department. (*See* Compl. ¶ 62.) Even if the Court gave great weight to these confidential witness statements, such statements would still fail to support a strong inference of scienter as to the Defendants because they concern how the Company's CRE lending was conducted under the direction of *Marcia Snyder,* the Company's Executive Vice President of Lending. Confidential Witness # 1 stated that Snyder would direct employees in the Credit Department to make loan disbursements before appraisals were complete and before all loan documents were compiled for closing. (Compl. ¶¶ 64, 66.) Confidential

Witness # 1 also recalled that Snyder—not any of the Individual Defendants—was frequently a proponent of character lending (*i.e.,* lending based on the borrower's reputation or net worth and not actual underwriting). (Compl. ¶ 63.) Importantly, however, Snyder is *not* a defendant in this action.[19] Moreover, the Complaint does not draw any connection between Snyder and any one of the Defendants and, therefore, there is no basis for imputing Snyder's knowledge or conduct on Defendants.

▮ The Steeplechase Loan is the closest Plaintiff comes to alleging fraud with particularity, but the Court is not persuaded that the events surrounding the approval of that particular loan create a strong inference that each Defendant acted with the requisite *scienter.* Importantly, as stated above, the Steeplechase Loan was made even before the Class Period began. Thus, the Steeplechase Loan is at best circumstantial evidence of the Company's lax underwriting procedures at a time prior to the Class Period. Additionally, Plaintiff alleges that A. Levan knowingly omitted to disclose to investors that the property securing the Steeplechase Loan was not worth the amount of the Company's investment, yet it is unclear how this omission implies scienter since the Complaint states that it was a non-defendant, Marcia Synder, who "walked the property" with "Bank executives" and determined that land was not valuable. (Compl. ¶¶ 81, 167.) Finally, the Complaint fails to allege that Defendants knew, or were reckless in not knowing, that the lending or accounting practices surrounding the Steeplechase Loan had the effect of rendering certain statements made by Defendants during

---

19. Similarly, the Complaint alleges that a confidential witness "told Jeff Mindling about 'five or ten times a day' that quality of certain loans in the Company's portfolio were not sound." (Compl. ¶ 85.) Jeff Mindling is also not a defendant, and the Complaint draws no connection between Jeff Mindling and any one of the Defendants.

the Class Period fraudulent.[20] This is especially true where none of the confidential witnesses identified any discussions, emails, or memorandum from or to any of the Individual Defendants discussing the Steeplechase Loan. *See Mizzaro*, 544 F.3d at 1247 (finding that allegations regarding the widespread nature and the amount of fraud is not sufficient to draw an inference that high-ranking officials acted with requisite scienter, especially where there was no claimed communications connecting the officials to the fraud). In sum, the Complaint does not demonstrate how the Company's approval of the Steeplechase Loan prior to the Class Period permits an inference of scienter as to each Defendant. Instead, it appears that Plaintiff is attempting to use circumstances surrounding a loan made prior to the Class Period to argue that each of the Defendants engaged in a broad course of fraudulent conduct during the Class Period. (*See* Compl. ¶ 83.) The Eleventh Circuit explicitly rejected the use of conclusory allegations regarding the widespread nature and amount of fraud to draw "strong inferences" that high-ranking officials, such as the Individual Defendants, acted with the requisite scienter. *Mizzaro*, 544 F.3d at 1247. Thus, the Court is unable to draw a "strong inference" from the pre-Class Period Steeplechase Loan that the Individual Defendants orchestrated or even knew about the alleged fraud and did nothing.

The Court is also unpersuaded that Plaintiff has adequately alleged scienter with respect to the alleged inadequate loss reserves. Plaintiff alleges that the Company was required under GAAP to reserve for potential credit losses and that the Company's reserves were materially understated in violation of GAAP. (*See* Compl. ¶ 115.) The Eleventh Circuit has recognized that GAAP violations standing alone are insufficient to plead fraud, but that such violations may be probative of scienter where they are combined with "[d]rastic overstatements of accounts or other red flags." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267–68 (11th Cir. 2006); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208 (11th Cir.2001).

According to a confidential witness, the Company "intentionally mischaracterized loans into less risky categories, particularly categorizing loans that would have been in the LAD portfolio into other categories to justify smaller reserves and thus, protecting the bottom line." (Compl. ¶¶ 68, 104.) However, as stated above, the Court has not been provided with any information regarding this confidential witness and, therefore, has no understanding of the foundation upon which this allegation is based. Further, this statement has no temporal context—it is not even clear whether these "mischaracterizations" occurred during the Class Period. Finally, this allegation is conclusory and tells the Court nothing about the number of loans mischaracterized, whether any of the Individual Defendants were responsible for the mischaracterization, whether the mischaracterization materially affected the Company's bottom line, or what constitutes "less risky categories."

The remaining factual allegation supporting Plaintiff's argument that the Company violated GAAP by failing to adequately reserve for loan losses also fails. Plaintiff alleges that the Company's reserves were decreasing as a percentage of its total non-accrual loans. (Compl. ¶ 108.)

---

**20.** Further, while a newspaper's interpretation of the events surrounding the Steeplechase Loan may support a Plaintiff's pleading fraud with particularity under Rule 9(b), it says little about the intent or knowledge of the Individual Defendants. (*See* Compl. ¶¶ 77, 82.)

Plaintiff provides no explanation, however, how this factual allegation creates a "strong inference" of scienter as to each of the Defendants. All other remaining factual allegations in the Complaint that the Company's loan loss reserves were inadequate depend wholly on the testimony of confidential witnesses regarding the Company's reckless lending practices, and, as the described above, this is not an adequate foundation to permit the inference of scienter because the Court cannot discern *anything* about reliability of such sources. Consequently, the Court cannot, under *Mizzaro*, accord any significant weight to such confidential witness statements.

Further, the Court notes that Plaintiff does not allege that Defendants failed to reserve for losses; Plaintiff's argument is simply that Defendants should have caused the Company to reserve *more*. (*See* Compl. ¶ 112) ("Thus, throughout the Class Period, as the level of non-accrual loans in BankAtlantics's portfolio increased, the allowance for loan losses *should have* substantially increased to keep pace." (emphasis added).) There are no allegations concerning financial restatements, auditor resignations, or other "red flags" that should have alerted the Individual Defendants to the fraud; the Company actually received a clean opinion as to its financials, which is a competing inference of scienter (*see* Mot. 17.) *See Druskin*, 299 F.Supp.2d at 1327, n. 27 (absence of restatement or auditor resignations undermined any inference of scienter). The argument that Defendants, looking back after the fall of the Florida real estate market, should have reserved more than they did does not reflect an extreme departure from the standards of ordinary care, and therefore, does not support a strong inference of scienter. *See Druskin*, 299 F.Supp.2d at 1328 (denying plaintiff's allegation that defendants should have reserved more vi-

olated GAAP and established the requisite scienter). Thus, Plaintiff has not alleged sufficient facts to demonstrate that each of the Defendants were severely reckless in attesting to the accuracy of the Company's financial statements or in failing to adequately reserve for loan losses. The Complaint in the instant matter, therefore, fails to allege scienter with specificity as to each of the Defendants because it does not set forth "what defendants knew, how they knew it, and when they knew it." *Feeney v. Mego Mortg. Corp.*, 45 F.Supp.2d 1356, 1357 (N.D.Ga. 1999) (pleading that defendants "must have known" the falsity of their statements was insufficient under the heightened pleading standards). Instead, the Complaint rests on vague allegations attributed to confidential witnesses for which no foundation or basis of knowledge is provided. Moreover, the facts that are stated with any particularity fail to raise a strong inference—one that is cogent and compelling—that the each Defendant acted with the requisite scienter. Plaintiff must "allege facts from which a reasonable person *would* infer that it is at least likely as not that the individual high-ranking defendants either orchestrated the alleged fraud (and thus always knew about it) ... or were otherwise reckless in not learning of the claimed fraud...." *Mizzaro*, 544 F.3d at 1247. The Complaint falls short of Congress's stringent test for pleading scienter.

## III. Causation

 Finally, Defendants argue that Plaintiff has inadequately pled loss causation. A private plaintiff who claims securities fraud has the burden of proving that the defendant's fraud caused an economic loss for which the plaintiff seeks to recover. 15 U.S.C. § 78u–4(b)(4). As explained by the Eleventh Circuit, "the plaintiff need

not show that the defendant's act was the sole and exclusive cause of the injury he suffered," rather, "he need only show that it was substantial, i.e., a significant contributing cause." *Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997). "In other words, plaintiff must show that the misrepresentation touches upon the reasons for the investments decline in value." *Id.* (citation and quotation omitted). Allegations of artificial price inflations alone do not satisfy the loss causation requirement. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 343, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Plaintiff's causation argument is essentially that the Company did not fully reveal its exposure in its CRE portfolio until October 26, 2007, and that up until that time it had falsely reassured its investors of its conservative lending practices. (Compl. ¶¶ 179–82, 194–200.) Specifically, Plaintiff alleges that the Company's exposure in its BLB segment was not disclosed until April 2007, at which time the Company's stock price fell 5%, and its exposure in the LAD and LADC segments were not revealed until October 2007, at which time the Company's stock fell another 38%. (Compl. ¶¶ 173–177, 183, 197, 200.) Plaintiff alleges that these belated disclosures of risk caused its losses. (Compl. ¶ 213.)

Assuming all alleged misrepresentations and omissions as true and drawing all inferences in favor of Plaintiff, the Court finds the Complaint adequately alleges how Defendants' misrepresentations and omissions "touched upon" the reason for the stocks' decline in value. Plaintiff did more then simply allege that stock was purchased at an artificially inflated price; Plaintiff alleged a causal relationship between certain statements and omissions and its pecuniary loss. *See Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346–47, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Thus,

the Complaint provides Defendants with notice of what the relevant economic loss might be, or of what the causal connection might be between that loss and the misrepresentation concerning the Company's exposure to risk. *See id.* at 347, 125 S.Ct. 1627 (stating that ordinary pleading rules applied to loss causation and dismissing a complaint for failure to provide the defendant with "some indication of the loss and the causal connection that the plaintiff [had] in mind"). Accordingly, the Court finds that Plaintiff's Complaint is legally sufficient in so far as it pleads loss causation.

## IV. Claims Against Individual Defendants

Because the Court finds that Plaintiff has not adequately plead scienter under the PSLRA, Plaintiff has in turn failed to state a claim against the Individual Defendants under Sections 20(a) and 20A of the Exchange Act. *See Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir. 1996); *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1351 (S.D.Fla.1998) ("Of course, without a primary violation of the securities laws, there can be no secondary violation under § 20(a)") (citing *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1132 (2d Cir.1994)); *Johnson v. Aljian,* 490 F.3d 778 (9th Cir.2007) (finding that claims under Section 20A are derivative and, therefore, require an independent violation under the Exchange Act).

### Conclusion

For the foregoing reasons, the Court finds that Plaintiff has failed to state a claim where the Complaint does not allege with the requisite particularity facts giving rise to a strong inference that each Defendant acted with scienter. It is hereby

ORDERED AND ADJUDGED that Plaintiff's Complaint is DISMISSED WITHOUT PREJUDICE. It is further

ORDERED AND ADJUDGED that Plaintiff shall have twenty (20) days from the date of this Order in which to serve an amended complaint that is in compliance with the PSLRA's pleading requirements. Failure to file an amended complaint by this date will result in dismissal of the Complaint with prejudice. It is further

ORDERED AND ADJUDGED that Defendants' Request for Oral Argument (D.E. 59) is DENIED AS MOOT.